Leroy M. TAYLOR and Weldon W. Christopher, Plaintiffs,

v.

The SECRETARY OF THE ARMY, Defendant.

Civ. No. H–78–740.

United States District Court, D. Maryland.

April 16, 1984.

Luther C. West and West, Carey, Frame & Barnstein, Baltimore, Md., for plaintiffs.

Robert D. Newberry, Litigation Div., Dept. of the Army, Washington, D.C. and Robert N. McDonald, Asst. U.S. Atty., Baltimore, Md., for defendant.

ALEXANDER HARVEY, II, District Judge.

This is a civil action brought by two black males under Title VII of the Civil Rights Act of 1964, 42 U.S.C. §§ 2000e et seq.[1] The defendant is their employer, the Secretary of the Army. Plaintiff Leroy M. Taylor formerly worked as a wage grade employee of the Army at Edgewood Arsenal before he retired in 1979. Plaintiff Weldon W. Christopher is still employed as a GS–11 employee of the Army at the Edgewood Area of Aberdeen Proving Ground.[2] Each plaintiff asserts that he was denied promotion because of his race, and each is here seeking back pay and other relief.

The pretrial proceedings in this case have been extensive.[3] Pursuant to the entry of an original and a supplemental Joint Pretrial Order, the case came on for trial before the Court sitting without a jury. Extensive testimony was presented by the parties, and numerous exhibits were admitted in evidence. At the request of the Court, the parties submitted proposed findings of fact and conclusions of law.[4] Findings of fact and conclusions of law pursuant to Rule 52(a), F.R.Civ.P., are contained in this opinion, whether or not so characterized. In resolving the disputed issues of fact, due regard had been had to the credibility of the witnesses and the weight that their testimony deserved.

## I

### The Background Facts

The facts pertaining to the employment history of plaintiff Taylor are quite different from those pertaining to plaintiff Christopher. Taylor never went beyond the eighth grade in school and was always a wage grade civilian employee while working for the Army. Christopher was a college graduate and has always worked for the Army at a GS grade.

A black male, plaintiff Taylor was first employed in a civilian capacity at Edgewood Arsenal, Maryland in early 1942. His employment there was interrupted between 1942 and 1946 by military service in World War II. Returning to Edgewood in the spring of 1946, Taylor was employed as a munitions handler at a C–5–3 grade (equivalent to WB–7). Over the years, he, as well as others in his organization, were affected by four separate reductions in force (hereinafter referred to as "RIFs" or

1. Following preliminary discovery, each plaintiff moved under Rule 23, F.R.Civ.P., for certification of this suit as a class action. Following a hearing, the Court, in an oral opinion, denied the motion of each plaintiff for class certification, and the case has proceeded as a suit brought by each plaintiff individually against the Secretary of the Army.

2. Edgewood Arsenal and Aberdeen Proving Ground were at one time maintained as separate military installations. However, prior to the critical times involved here, they had been merged into one Army command, which will be referred to herein as Edgewood-Aberdeen.

3. Suit was filed on April 28, 1978. Much of the delay in completing pretrial proceedings occurred when this action was, by agreement of the parties, stayed on June 1, 1979, pending remand to the Secretary of the Army for administrative consideration of plaintiffs' class action complaints. When the administrative process was completed, proceedings resumed in this Court.

4. Each side filed initial findings of fact and conclusions of law and thereafter responded to the other side's submission by supplemental findings and conclusions. After reviewing these submissions, the Court has made its own findings and conclusions pursuant to Cuthbertson v. Biggers Bros., Inc., 702 F.2d 454, 458–459 (4th Cir.1983).

"RIF"). Following several of these RIFs between 1946 and 1966, Taylor was reemployed at a lower grade but was thereafter promoted back from time to time to higher positions. During one period of his employment career between 1952 and 1957, Taylor attained the equivalent of a WB–8 level as an explosives operator. However, in September, 1957, a RIF resulted in his reduction in grade to WB–6. In 1966, following another RIF, he occupied the position of WB–4, munitions handler. In that year, this latter position was abolished, and Taylor applied for and was transferred into the Animal Colony at Edgewood. Various animals were maintained at this Army facility and were used for biological research. Taylor's duties as an animal caretaker included feeding and attending the animals, cleaning their cages and preparing them for innoculations and experiments made by Army officers.

In 1967, Taylor was promoted to a WG–6 position.[5] In 1969, he was promoted to a WG–7. This was the highest position available in the Animal Colony, except for the so-called leader positions. Between 1969 and the date of Taylor's retirement in 1979, there were no openings for a leader position in the Animal Colony. Although he was aware that there were no vacancies in the Animal Colony to which he might be promoted, Taylor did not apply for a promotion to a position in some other field at Edgewood, nor did he apply for a transfer. In 1971, Taylor was encouraged to enroll in the Army's Upward Mobility Program which was designed to train lower-grade employees in new skills so that they might be promoted to higher paying positions. After attending an orientation briefing, Taylor declined to participate in the Program. Taylor testified that he did not apply for a promotion to or for a transfer to a better job because he felt it was largely futile for black WG employees to seek better jobs or promotions. Accordingly, when Taylor retired in February, 1979, he was still at a WG–7 level.

Between September of 1974 and September of 1976, Taylor complained on several occasions to the Army's EEO counselor at Edgewood-Aberdeen of his lack of advancement. On November 15, 1976, Taylor filed a formal EEO complaint incorporating an earlier informal complaint in which he claimed that he had been denied access to a higher paying job because of the Army's discriminatory promotion policy. This complaint was processed administratively at various levels. Following a hearing, a Civil Service Commission examiner determined that the Army had not violated Taylor's rights under Title VII. The Army's Director of EEO thereafter approved the examiner's decision. Taylor then joined with the co-plaintiff Christopher in filing suit in this Court on April 28, 1978.

Taylor is here seeking an award of back pay as a WG–12 dating from October 14, 1974 until February 19, 1979, when he retired. Claiming that he should have been retired as a WG–12, he is also claiming back retirement pay from the date of his retirement until the present. Some $30,000 in damages is thereby claimed, as well as declaratory, injunctive and other relief.

A black male, plaintiff Christopher received a BS degree from Virginia State University. In 1954, he was employed by the Army as a bacteriologist at Ft. Dietrick, Maryland at a GS–5 level. He was subsequently promoted to a GS–7 in 1956, to a GS–9 in 1960 and to a GS–11 in 1963. Thereafter, his supervisor, a Dr. Yaverbaum initiated proceedings to reduce Christopher in grade because of poor duty performance. Christopher objected, claiming the action was racially discriminatory. However, he was unsuccessful in his administrative challenge to this reduction in grade, and the Army's administrative ruling was eventually upheld by a Civil Service Commission examiner. Accordingly, on September 17, 1967, Christopher was demoted to a GS–9 microbiologist position.

5. The letters used for these positions were changed from WB to WG on some date during the 1960's.

In 1971, pursuant to the President's decision to limit the development of instruments for offensive chemical and biological warfare, Ft. Dietrick was closed. Research relating to defensive chemical and biological warfare was, however, continued at Edgewood Arsenal, and Christopher was transferred to that facility where he continued his employment as a GS–9 microbiologist. In December of 1976, Christopher complained to his branch chief, Ira M. Abelow, that he was not being considered for a GS–11 microbiologist position which he believed was then open in the branch. On December 30, 1976, an informal complaint of racial discrimination was filed with the EEO counselor at Edgewood-Aberdeen. Thereafter, Christopher filed a formal EEO complaint. When he was denied relief administratively, he joined with Taylor in filing this suit.

On August 5, 1979, while this action was pending, Christopher was promoted to a GS–11 microbiologist position. When he testified at the trial of this case, Christopher was still employed at Edgewood-Aberdeen at a GS–11 level. Plaintiff Christopher is seeking in this suit back pay as a GS–11 from December 15, 1976 until August 5, 1979. In addition, he contends that he should receive back pay representing the difference between GS–11 Step 5 and GS–11 Step 8. His total claim is therefore some $18,000 and in addition to seeking other appropriate relief, he is asking that his present pay grade be elevated to GS–11 Step 10.

## II

### The Applicable Legal Principles

Plaintiffs concede that they are proceeding in this case under a disparate treatment theory. Disparate treatment is said to define a situation where the employer simply treats some people less favorably than others because of their race, color, religion, sex or national origin. *Wright v. National Archives and Records Service,* 609 F.2d 702, 711 (4th Cir.1979), quoting from *International Brotherhood of Teamsters v. United States,* 431 U.S. 324, 335 n. 15, 97 S.Ct. 1843, 1854 n. 15, 52 L.Ed.2d 396 (1977). Thus, following dismissal of the class claims, this action has been reduced to a classic Title VII suit involving individual claims of disparate treatment challenging isolated employment decisions. *See Miller v. Mercy Hospital Incorporated,* 720 F.2d 356, 360 (4th Cir.1983).

■ In a case of this sort involving individual claims of employment discrimination, the applicable legal principles are well known. In *McDonnell Douglas Corp. v. Green,* 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973), the Supreme Court established a three-step procedure for the determination of racial employment discrimination cases brought under Title VII of the Civil Rights Act of 1964. As the first step, the plaintiff is required to carry the burden of proving a *prima facie* case. In *McDonnell Douglas,* a case involving alleged discrimination in hiring, Justice Powell said the following, at p. 802, 93 S.Ct. at p. 1824:

"The complainant in a Title VII trial must carry the initial burden under the statute of establishing a *prima facie* case of racial discrimination. This may be done by showing (i) that he belongs to a racial minority; (ii) that he applied and was qualified for a job which the employer was seeking applicants; (iii) that, despite his qualifications, he was rejected; and (iv) that, after his rejection, the position remained open and the employer continued to seek applicants from persons of complainant's qualifications."

■ If the plaintiff satisfies this initial requirement, the burden then shifts to the defendant to articulate a legitimate, non-discriminatory reason for the action taken.

The burden then must shift to the employer to articulate some legitimate, non-discriminatory reason for the employee's rejection. We need not attempt in the instant case to detail every matter which fairly could be recognized as a reasonable basis for [the action].

411 U.S. at 802–803, 93 S.Ct. at 1824.

■ But even if the defendant satisfies its initial burden and meets the plaintiff's *prima facie* case, that is not the end of the inquiry which a trial court should make,

because an otherwise valid reason advanced by the employer may be used as a pretext for the action taken. The third step of the procedure in question was described by Justice Powell, as follows:

Petitioner's reason for rejection thus suffices to meet the *prima facie* case, but the inquiry must not end here. While Title VII does not, without more, compel rehiring of respondent, neither does it permit petitioner to use respondent's conduct as a pretext for the sort of discrimination prohibited by § 703(a)(1). On remand, respondent must, as the Court of Appeals recognized, be afforded a fair opportunity to show that petitioner's stated reason for respondent's rejection was in fact pretext.

And a little further along:

Other evidence that may be relevant to any showing of pretext includes facts as to the petitioner's treatment of respondent during his prior term of employment; petitioner's reaction, if any, to respondent's legitimate civil rights activities; and petitioner's general policy and practice with respect to minority employment. On the latter point, statistics as to petitioner's employment policy and practice may be helpful to a determination of whether petitioner's refusal to rehire respondent in this case conformed to a general pattern of discrimination against blacks.

411 U.S. at 804–805, 93 S.Ct. at 1825.

In footnote 19, at page 805, 93 S.Ct. footnote 19, at page 1826, Justice Powell further observed that the trial court may consider any racial composition of a defendant's labor force as itself reflective of restrictive or exclusionary practices, but cautioned that such general determinations, while helpful, may not in and of themselves be controlling as to "an individualized hiring decision," particularly in the presence of otherwise justifiable reason for rejection of the employee.

■ These principles were recently reaffirmed in *Texas Department of Community Affairs v. Burdine,* 450 U.S. 248, 101 S.Ct. 1089, 67 L.Ed.2d 207 (1981). Decisions of the Supreme Court and of the Fourth Circuit since *McDonnell Douglas* have made it clear that the burden placed upon the defendant in a Title VII case of this sort to articulate some legitimate nondiscriminatory reason for his action is not a burden of proof, but rather is that of producing an explanation. *Board of Trustees v. Sweeney,* 439 U.S. 24, 99 S.Ct. 295, 58 L.Ed.2d 216 (1978); *Furnco Construction Corp. v. Waters,* 438 U.S. 567, 98 S.Ct. 2943, 57 L.Ed.2d 957 (1978); *Wright v. National Archives and Records Service, supra,* at 713–715; *Ambush v. Montgomery County Government Department,* 620 F.2d 1048, 1054 (4th Cir.1980). The burden of persuasion of a violation of Title VII does not shift but remains throughout upon the plaintiff. *Wright, supra* at 714. The ultimate factual inquiry in a Title VII case is whether the defendant intentionally discriminated against the plaintiff by treating the plaintiff less favorably than others because of his race. *United States Postal Service v. Aikens,* 460 U.S. 711, 103 S.Ct. 1478, 1481, 75 L.Ed.2d 403 (1983).

■ This particular case presents precisely the type of "individualized" employment decision mentioned by Justice Powell 411 U.S. at page 805, 93 S.Ct. at page 1826–27 of the *McDonnell Douglas* opinion. In this case, each plaintiff has charged defendant with failing to promote him to a higher paying position because of his race. The *McDonnell Douglas* standard must therefore be adapted to these allegations of discriminatory failure to promote. In a case such as this one, the Court in particular must focus on questions concerning whether a promotional position was open, whether each plaintiff actually applied for that position and whether each plaintiff was qualified for the position he sought.

■ Plaintiffs contend that in this case the traditional *McDonnell Douglas* test should not be applied. Plaintiffs assert that since they are here charging the defendant with an on-going pattern and practice of racial discrimination, their burden of proof and the order and allocation of that

burden is not the traditional *McDonnell Douglas* test but is rather the standard set forth by the Supreme Court in *Franks v. Bowman Transportation Co.,* 424 U.S. 747, 751, 96 S.Ct. 1251, 1257–58, 47 L.Ed.2d 444 (1976) and reiterated in *International Brotherhood of Teamsters v. United States, supra,* 431 U.S. at 359, 97 S.Ct. at 1866–67. Relying upon the *Franks* and *Teamsters* cases, plaintiffs contend that in an individual pattern-and-practice suit they are not required to prove that they applied for and were qualified for the positions to which they sought to be promoted nor that the vacancies themselves remained open. They assert that they have met their *prima facie* burden of proving employment discrimination by showing through statistical evidence a pattern-and-practice of discrimination by their employer at the Edgewood-Aberdeen facility and that in view of this evidence, the burden of proof has shifted to the defendant to prove that he did not deny these particular plaintiffs the employment rights guaranteed by Title VII. It is therefore claimed that the defendant here has the burden of proving that each plaintiff did not apply for and was not qualified for the position to which he sought to be promoted and of proving that the vacancy in question did not exist or did not remain open. Moreover, plaintiffs argue that once they have proven their *prima facie* case by showing a pattern-and-practice of discrimination, defendant is presumed to have discriminated against every affected minority employee within the ambit of the pattern-and-practice involved and that defendant must then overcome this presumption by proving that his individual treatment of each plaintiff was not discriminatory.

After considering the arguments of counsel and the cases cited, this Court concludes that since individual claims of employment discrimination are involved in this case, the traditional *McDonnell Douglas* framework should be applied here. The *Franks* case was a class action brought against an employer and labor unions alleging a pattern or practice of racial discrimination in various company policies, including hiring, transfers and discharges. *See* 424 U.S. at 751, 96 S.Ct. at 1257–58. The

*Teamsters* case was similar inasmuch as it involved a suit brought by the government on behalf of a large group of employees under the specific pattern-or-practice provision of Section 707(a) of Title VII. This Court concludes that the *Franks-Teamsters* rationale is applicable only in class action suits or in suits brought by the government on behalf of a large group of claimants. The Supreme Court has never employed the *Franks-Teamsters* approach in an individual suit charging employment discrimination. Rather, in every such individual suit considered by the Supreme Court, the traditional *McDonnell Douglas* test has been employed.

This is not to say that statistical evidence like that presented by the plaintiffs here is not relevant in an individual, disparate treatment case like this one. If a *prima facie* case of racial discrimination has been proved by a plaintiff, statistics as to a defendant's employment policies and practices may indeed be helpful in a determination whether the adverse employment decision at issue conformed to a general pattern of discrimination against blacks. *McDonnell Douglas, supra* 411 U.S. at 805, 93 S.Ct. at 1825–26. However, a plaintiff may not avoid his burden of proving each of the separate elements of a *prima facie* case by relying merely on statistical evidence which purportedly establishes a pattern-and-practice of racial discrimination. As the Supreme Court observed in the *Teamsters* case, 431 U.S. at 358, n. 44, 97 S.Ct. at 1866, n. 44:

An employer's isolated decision to reject an applicant who belongs to a racial minority does not show that the rejection was racially based. Although the *McDonnell Douglas* formula does not require direct proof of discrimination, it does demand that the alleged discriminatee demonstrate at least that his rejection did not result from the two most common legitimate reasons on which an employer might rely to reject a job applicant; an absolute or relative lack of qualifications or the absence of a vacancy in the job sought.

In *Hudson v. International Business Machines Corp.*, 620 F.2d 351 (2d Cir.1980), the Second Circuit rejected an argument similar to the one advanced by the plaintiffs here. In that individual suit brought under Title VII, the plaintiff contended that his employer had discriminated against him as to promotions, transfers and assignments because he was black. Having lost at the trial level, the plaintiff on appeal contended that the trial judge had erroneously failed to consider as proof of his *prima facie* case statistical evidence which purportedly showed that black professional employees were discriminated against in advancing beyond his level at defendant's New York Programming Center. In affirming the lower court, the Second Circuit concluded that since the case was not a class action or disparate impact case, statistical evidence of a pattern and practice of discrimination could not be used to establish a *prima facie* case of racial discrimination. The Court held that in an individual disparate treatment case the traditional *McDonnell Douglas* standards must be applied to determine whether the particular employee has been discriminated against because of his race. 620 F.2d at 355. To the same effect are several earlier Circuit Court opinions, including *King v. Yellow Freight Systems, Inc.*, 523 F.2d 879, 882 (8th Cir.1975); *Harper v. Trans World Airlines, Inc.*, 525 F.2d 409, 412 (8th Cir. 1975). Moreover, in *Opara v. Modern Mfg. Co.*, 434 F.Supp. 1040, 1044 (D.Md.1977), Judge Murray of this Court held that, although relevant, statistical evidence does not automatically make out a *prima facie* case in an individual suit brought on behalf of a single plaintiff.

In arguing that the traditional *McDonnell Douglas* framework should not be applied in this case, plaintiffs rely on the opinion of the United States Court of Appeals for the District of Columbia Circuit in *Davis v. Califano*, 613 F.2d 957 (D.C.Cir. 1979). In a 2–1 decision, the Court in *Davis* held that statistical evidence may establish a *prima facie* case of employment discrimination in an individual as well as in a class action discrimination case. The opinion was authored by District Judge

Robinson (sitting by designation) and Circuit Judge MacKinnon filed a vigorous dissent.

This Court will not follow the *Davis* decision for several reasons. First, *Davis* was decided on November 8, 1979 and later amended on February 14, 1980. The *Burdine* decision of the Supreme Court was filed over a year later, on March 4, 1981. Thus, the Court in *Davis* did not have the benefit of the Supreme Court's *Burdine* opinion. *Burdine* discussed in some detail the basic allocation of burden and order of presentation of proof in an individual Title VII case alleging discriminatory treatment. In reaffirming the *McDonnell Douglas* standard, the Supreme Court in *Burdine* noted a distinction between an individual and a class suit. It specifically recognized that the factual issues and therefore the character of the evidence presented differ when a plaintiff claims that an employment policy has a discriminatory impact on protected classes. 450 U.S. 252, n. 5, 101 S.Ct. 1093 n. 5.

Moreover, *Burdine* made it clear that if the plaintiff in an individual Title VII suit succeeds in proving a *prima facie* case, the burden on the defendant is merely to "articulate" a legitimate non-discriminatory reason for the employee's rejection. In *Davis*, the District of Columbia Court of Appeals held that after a *prima facie* case had been established by statistical evidence, the burden of proof actually shifts to the employer and that in order to defeat the plaintiff's right to recovery, the defendant must prove that the statistical evidence was inaccurate or insignificant, or that the individual claimant was denied an employment benefit for lawful reasons. 613 F.2d at 962. *Burdine* makes it clear that no such burden of proof is placed upon a defendant in an individual Title VII case, and *Davis* therefore is not in accord with the law as enunciated by the Supreme Court. As Judge MacKinnon pointed out in his dissent, the Supreme Court in the *Furnco* case, in concluding that the proper approach in that individual suit was the analysis contained in *McDonnell Douglas*, distinguished that case from one like *Team-*

*sters* which was a pattern-or-practice case. 438 U.S. at 575 n. 7, 98 S.Ct. at 2948–49 n. 7. By permitting a *prima facie* case to be proved by statistical evidence, the Court in *Davis* completely eliminated the basic requirements of *McDonnell Douglas* that a plaintiff must prove as a part of his case that he applied for and was qualified for the position he sought and that a vacancy existed. As Judge MacKinnon points out, the majority opinion in *Davis* fails to address this question. The Fourth Circuit has recently observed that the general rule of *McDonnell Douglas* "represents the present limit of authoritatively approved relaxation of the normal burdens of production and persuasion borne by claimants in this type of case." *Miller v. Mercy Hospital, Inc., supra* at 364, n. 10.

Finally, this Court would note that the Court in *Davis* specifically disapproved of language in *Terrell v. Feldstein Co.,* 468 F.2d 910 (5th Cir.1972), in *Harper v. Trans World Airlines, Inc., supra,* and in *King v. Yellow Freight System, Inc., supra,* suggesting that statistical proof may establish a *prima facie* case only in a class action. *See* 613 F.2d at 962, n. 35. This Court finds more persuasive than *Davis* the opinions of the Fifth and Eighth Circuits cited hereinabove and also the opinion of the Second Circuit in *Hudson v. International Business Machines Corp., supra.* Accordingly, the *Davis* case will not be followed here.[6]

### III

#### The Claim of Plaintiff Taylor

Under the *McDonnell Douglas* test as applied to the facts of this case, plaintiff Taylor has initially the burden of establishing (1) that he belongs to a racial minority; (2) that he applied for a promotion to one or more positions between the years 1974 and 1976; (3) that he was qualified for promotion to one of the positions for which he applied; (4) that he was not placed in any one of those positions; and

(5) that at the time of his rejection the positions in question remained open and the Army continued to seek applicants from persons of Taylor's qualifications. As to plaintiff Taylor's claim, there is no dispute in this case concerning the first and fourth elements. Plaintiff Taylor is a black male, and he was not promoted to a level higher than a WG–7 during the years in question. Defendants contend, however, that plaintiff Taylor has not satisfied his burden of proving that he ever applied for any other open position at Edgewood-Aberdeen and further that he has not proven that he was qualified for any such position which might have been available and which remained open during the years in question.

On the record here, this Court finds that plaintiff Taylor has not met his burden of proving an individual *prima facie* case of racial discrimination. Indeed, Taylor concedes that he never applied for a transfer or promotion while he was an animal caretaker at the WG–7 level. He contends and so testified that he made no such application for a promotion because he believed that it was futile in view of his perception of an on-going policy of discrimination by the Army against black employees.

Relying on *International Brotherhood of Teamsters v. United States, supra,* plaintiff Taylor argues that his failure to submit an application for a promotion should not bar his recovery in this case because it would have been futile for him to do so. *See* 431 U.S. at 362–367, 97 S.Ct. at 1868–1871. But *Teamsters* was a class action in which it had been proved that the employer had engaged in a pattern-and-practice of racial discrimination. Having determined that liability existed, the Supreme Court went on to consider issues pertaining to the damages to be awarded to individual members of the class, and in that context discussed the question of a non-applicant's right of recovery. *See also Claiborne v. Illinois Central Railroad,* 583

---

**6.** In one of their post-trial briefs, plaintiffs argue that the Fourth Circuit in *EEOC v. Ford Motor Co.,* 645 F.2d 183 (4th Cir.1981) followed the *Franks-Teamsters* order and allocation of the burden of proof. However, the *Ford Motor Co.*

case, like the *Teamsters* case, was an action brought by the government on behalf of a group of employees. Since it was not, as here, an individual disparate treatment case, it has little relevancy to the issues presented in this case.

F.2d 143, 150–151 (5th Cir.1978). The Supreme Court recognized in *Teamsters* that even after liability had been established, a non-applicant undertook a "difficult task" in proving that he should be treated in the same manner as one who had applied for a position (431 U.S. at 364, 97 S.Ct. at 1869) and that the burden of proving that such a non-applicant would have applied for the position had it not been for the employer's discriminatory practices was "not always easy ..." (431 U.S. at 368, 97 S.Ct. at 1871).

Even assuming that the *Teamsters* rationale is applicable to proof of liability in this individual Title VII case, plaintiff Taylor has not met his burden of proving that he did not apply for a promotion or transfer because he believed it was futile to do so. Taylor's testimony to this effect will not be credited by the Court. Indeed, other substantial evidence in the case refutes this testimony. Although like others he was subjected to RIFs from time to time, he himself had been regularly promoted to higher positions until he reached the WG–7 level. Concededly, there were no openings above that level between 1974 and 1979 when Taylor finally retired. Other black employees, many of whom were called by plaintiffs to testify in this case, consistently filed applications for promotion even though they testified that it was their belief that the Army followed a policy of discriminating against blacks.[7] The evidence further indicates that many black employees at Edgewood-Aberdeen were in fact promoted. Taylor knew this, and the Court cannot on this record credit his testimony that he did not apply for a promotion or transfer because he believed it was futile to do so.

In view of the evidence presented, plaintiff will not be permitted to side-step, by the simple expedient of claiming futility, the basic requirement of *McDonnell Douglas* that he show a genuine interest in a particular position by applying for the promotion to which he aspired. Taylor's own testimony concerning the promotional position or positions he was seeking can best be described as confusing, indicating that he himself was not sure of the positions he might like to seek. Other evidence in the case relied on by plaintiff Taylor did little more than show that there might, at the critical times involved here, have been positions available at Edgewood-Aberdeen which Taylor might have been qualified to fill. However, he never applied for any of these possible positions. In the absence of a timely application for the promotion, it cannot be known whether plaintiff Taylor in fact had a genuine intention to accept the particular employment in question, or whether the claim he is now making is merely based on hindsight. Furthermore, it cannot be determined in the absence of such an application whether Taylor was qualified for the position in question and whether the position remained open following his alleged rejection.

Plaintiff Taylor has only himself to blame for his lack of advancement during his employment career. Although he had never gone beyond the eighth grade in school, Taylor failed to complete courses which would have awarded him his G.E.D., although afforded an opportunity to do so. As disclosed by plaintiff Taylor's Exhibit No. 41, Taylor, after reaching the WG–7 level, elected in 1979 not to file for non-competitive re-promotion to the WG–8 munitions operator position which he held from July 1952 to September 1957. Subsequently, in February 1976, a notice was published and disseminated to all employees explaining how they might apply for special consideration for re-promotion. Various position vacancies were advertised between 1974 and 1978 including at least six vacancies at the WG–8 level. Although qualified for these positions, Taylor did not apply for reconsideration either as a re-promotion eligible or in competition with others.

Moreover, Taylor did not take advantage of the Army's Upward Mobility Program

---

7. The witnesses Jackson, Poag, Macklin, Landrum (who is a friend of Taylor's), and Dawson, all of whom were black, testified that they did apply for promotions even though they did not feel that they were treated fairly at Edgewood-Aberdeen.

which was designed specifically for employees whose skills and advancement opportunities were limited and which provided for training in new skills which would result in promotion to a higher level position. In April 1971, after attending an orientation briefing, Taylor declined to participate further in the Program. The witnesses Mallory and Owens (both black males called by plaintiffs as rebuttal witnesses) did participate in the Army's Upward Mobility Program and testified that they would recommend it for those in "dead-end" positions and for persons who "wanted to get somewhere."

Counsel for plaintiff Taylor has argued that defendant had a duty to find and offer Taylor a better paying job in 1976, and that its failure to do so was evidence of racial discrimination. Title VII imposes no such duty on an employer. On the contrary, *McDonnell Douglas* makes it clear that to recover under Title VII a plaintiff must prove that he in fact applied for promotion to a particular position before a Court can determine whether he was denied the promotion because of his race.

 In support of the claim that he has asserted in this case, plaintiff Taylor further contends that because of his race he was subjected to harassment and unfair treatment by his supervisor in the Animal Colony, Melvin F. Hesseling, a white male. Other than Taylor's testimony, there is little in the record to support this contention. Taylor was a chronic complainer who constantly expressed dissatisfaction with various aspects of his employment as an animal caretaker.

Taylor complained that Hesseling's dog sat in his chair, that he was not provided transportation between buildings where he worked, that he was not properly paid after working overtime, that he was improperly accused of drawing a beard and mustache on a poster depicting President Ford and that Hesseling cursed at him in front of other employees. Taylor attributed all of these occurrences to racial bias on the part of his supervisor. On the record here, this

Court finds that all of Taylor's complaints resulted essentially from his general dissatisfaction with the unpleasant work which he, like others in the Animal Colony, was assigned to do.

That there were personality conflicts between Taylor and Hesseling is clear, but this Court concludes from the evidence that these conflicts were not racially motivated. Much of the work of persons employed as animal caretakers at Edgewood-Aberdeen was indeed unpleasant and dirty. However, Hesseling did not assign jobs by race but rather rotated them among all of his employees. Hesseling, during his testimony, impressed the Court as a conscientious supervisor of the persons working under him in the Animal Colony, and his testimony will in large part be credited. In spite of their differences, Hesseling showed no rancor towards Taylor and had recommended him on several occasions for monetary awards. On April 14, 1975, Hesseling had written a letter of appreciation commending Taylor for the work he had been performing in the Animal Colony. After Taylor had retired, Hesseling received a call from a representative of Johns Hopkins Hospital asking for a reference for Taylor. Hesseling gave Taylor a good reference and advised that he would rehire Taylor for further work in the Animal Colony at any time. In spite of Taylor's many complaints, Hesseling testified that Taylor did a reasonably good job for him.[8] On the record here, this Court finds and concludes that plaintiff Taylor has not proved that he was subjected to racial harassment or unfair treatment by his supervisor during the time that Taylor worked in the Animal Colony.

### IV

*The Claim of Plaintiff Christopher*

 Somewhat different questions are presented by the claim asserted in this case by plaintiff Christopher. Under the *McDonnell Douglas* test as applied to the

**8.** Taylor was better working with dogs than with cats. However, he had a real problem in handling monkeys and was frequently bitten by them.

facts of this case, plaintiff Christopher has initially the burden of establishing (1) that he belongs to a racial minority; (2) that he applied for a promotion in late 1976 or early 1977; (3) that he was qualified for the promotion he sought; (4) that he did not receive the promotion; and (5) that at the time of his rejection a position was open, the position remained open and the Army continued to seek applicants from persons of Christopher's qualifications to fill the position. Insofar as plaintiff Christopher's claim is concerned, there is no dispute in this case concerning the first, second, third and fourth elements. Plaintiff Christopher is a black male, and he applied for but was not promoted to a position as a GS–11 microbiologist in the biological branch at Edgewood-Aberdeen. Moreover, Christopher was qualified for such a GS–11 job in late 1976 or early 1977. Defendant contends, however, that there was no position which was open in 1976 or early 1977 and which remained open during the year.

On the record here, this Court finds that plaintiff Christopher has not met his burden of proving a *prima facie* case of racial discrimination in that he has not shown that at the time of his rejection there was a position available to which he might have been promoted. Although Christopher was qualified for promotion even in the absence of an open position, budgetary constraints in effect in the Biological Defense Branch in late 1976 and early 1977, as well as other factors, prohibited a promotion of the sort sought by Christopher. Moreover, plaintiff Christopher has not met his burden of proving that the vacancy he sought remained open and was later filled by a white male.

During the years in question, Ira M. Abelow was Chief of the Biological Defense Branch at Edgewood-Aberdeen. Christopher worked under Abelow as a GS–9. There were some 10 to 12 microbiologists in this unit, as well as chemists, physicists and others. In early 1977, an employee named Mullican, a GS–11 retired. It was this position that Christopher sought. However, the work that Mullican was doing required much more expertise than Christopher possessed. Moreover, Abelow was at the time under orders to reduce the average grade level of employees under his supervision. Thus, the position was never filled with a microbiologist, either white or black. In September 1977, Abelow did hire Lt. Berry, a white male, at a GS–11 level. However, Berry was a chemical engineer, and he was hired because Abelow needed more engineers in the branch to accomplish his mission. There had been a change in emphasis in the branch from research and development to actual production.

In late 1977, there were besides plaintiff Christopher two other GS–9 employees who were also qualified for promotion to a GS–11 level. Both were white. Duckworth, a chemist, had formerly been a GS–12 but had been reduced to GS–9 as the result of a RIF. Kraybill, a microbiologist like Christopher, had also worked as a GS–12 and had also been downgraded from that position as the result of a RIF. According to Abelow, both Duckworth and Kraybill were better qualified than was Christopher for promotion to a GS–11 position in early 1977. Both had previously held higher positions than Christopher. Kraybill also had earned a masters degree. Neither of these white employees was promoted in 1977 to a GS–11 position, although both at the time were seeking such a promotion, and both had qualifications superior to those of Christopher.

It is apparent from these facts that plaintiff Christopher was not subjected to racial discrimination when he was not promoted to a GS–11 position in early 1977. There was simply no opening at the time. Neither he nor two better-qualified white males received any promotion in 1977 after Mullican's retirement. Had there been such an opening, it is apparent that either Duckworth or Kraybill would have been given the position rather than Christopher because each of them was better qualified than he. In any event, the fact that no one filled this position indicates that there was no opening at the time.

Two years later, in 1979, Christopher and these two other white GS–9 employees were all promoted to a GS–11 position. At

that time, the promotional restrictions which had existed in the branch in 1977 were no longer present. Since all three of these GS–9 employees were then qualified for the promotion, they were all promoted to a GS–11 at or about the same time.

Other evidence in the case indicates that Abelow did not discriminate against black employees under his supervision. Stanford Mumford, a black biologist, had been promoted by Abelow in June of 1976 to a GS–13 position. Mumford testified that he had frequent contact with Abelow and that he never observed any action on Abelow's part to indicate that Abelow was racially prejudiced. Another black professional by the name of Randall had also been promoted by Abelow at or about this same time to a GS–12 position.

For all these reasons, this Court finds and concludes that plaintiff Christopher has not met his burden of proving a *prima facie* case of racial discrimination. There was no vacancy open at the time that he applied for a promotion. Moreover, the vacancy that he sought did not remain open during the times in question and was not filled by a person of another race.

V

*Statistical Evidence*

█ The statistical evidence presented by the plaintiffs has little relevancy in this case. As noted by the Court, this suit is concerned with individualized employment decisions. Statistical evidence may indeed be relevant in a Title VII case and can be particularly helpful in proving pretext in a disparate treatment case. *See Kralowec v. Prince George's County, Maryland,* 503 F.Supp. 985 (D.Md.1980), *aff'd* 679 F.2d 883 (4th Cir.1982), *cert. denied,* 459 U.S. 872, 103 S.Ct. 159, 74 L.Ed.2d 132 (1982). However, in this case, since neither plaintiff has met his burden of proving a *prima facie*

case, the statistical evidence presented is not pertinent.

█ Moreover, the statistical evidence relied upon here by the plaintiffs would in any event be entitled to little weight. Plaintiffs have done no more than introduce in evidence raw statistics which purport to show that there is a disparity between black and white employees at the higher WG and GS levels at Edgewood-Aberdeen. Plaintiffs' reliance on these statistics is misplaced for several reasons. No experts were called by plaintiffs to analyze the figures in question and relate them to the particular promotional positions sought by the plaintiffs.[9] Title VII did not become applicable to federal employees until 1972. Thus, a discriminatory pattern which resulted from pre-act rather than post-act employment decisions is beyond the reach of Title VII. *International Brotherhood of Teamsters v. United States, supra,* 431 U.S. at 360, 97 S.Ct. at 1867.

To be entitled to weight then, statistics such as those presented in this case should exclude or make some allowance for persons (both black and white) hired before 1972 when the Army was apparently hiring more blacks than whites at lower paying jobs. A discriminatory pattern of that sort, which occurred before the statute was passed, has been described by the Supreme Court as "merely an unfortunate event in history which has no present legal consequences." *United Airlines, Inc. v. Evans,* 431 U.S. 553, 558, 97 S.Ct. 1885, 1889, 52 L.Ed.2d 571 (1977). If there were a disproportionate number of whites occupying higher paying positions before 1972, a substantial number of them would presumably still be holding higher level jobs in 1976 and 1977. By failing to exclude or account for non-actionable employment events occurring prior to 1972, the statistics in evidence, offered to prove actionable employment events occurring after that date, are

---

9. The evidence presented did not include a work force analysis, multiple regression analyses or applicant flow data. *See Allen v. Prince George's County, Maryland,* 538 F.Supp. 833, 848–854 (D.Md.1982). Nor were the statistics analyzed by a witness in terms of standard deviations.

*See Castaneda v. Partida,* 430 U.S. 482, 496–497, 97 S.Ct. 1272, 1281–1282, 51 L.Ed.2d 498 (1977); *Equal Employment Opportunity Commission v. Federal Reserve Bank of Richmond,* 698 F.2d 633, 647–648 (4th Cir.1983).

distorted. *See Hazelwood School District v. United States,* 433 U.S. 299, 309–310, 97 S.Ct. 2736, 2742–2743, 53 L.Ed.2d 768 (1977). Even though a defendant may not have engaged in racial discrimination after the applicable date of Title VII, statistics of the sort in evidence here would tend to show present discrimination because of employment decisions made prior to the effective date of the statute. *See Equal Employment Opportunity Commission v. United Virginia Bank,* 615 F.2d 147, 150 (4th Cir.1980).

Furthermore, other circumstances would have to be weighed and considered by the Court before it could rationally reach the conclusion that the smaller number of black employees in higher positions at Edgewood-Aberdeen constituted acceptable proof of racial discrimination. As the Supreme Court admonished in the *Teamsters* case: "Statistics ... come in infinite variety... [T]heir usefulness depends on all of the surrounding facts and circumstances." 431 U.S. at 340, 97 S.Ct. at 1856–1857; quoted in *Hazelwood School District, supra* 433 U.S. at 312, 97 S.Ct. at 2744. Before the figures in evidence can be found to be meaningful, the following other factors would have to be considered: the number of blacks who have applied for promotions as compared to the number of whites applying; the qualifications of black applicants as compared to those of white applicants; the shrinkage during the 1970's of the total number of employees at Edgewood-Aberdeen; [10] and the effect of numerous RIFs on available promotional opportunities. Since the net effect of these factors on the raw figures themselves has not been explained by expert testimony or by other evidence in the case, this Court concludes that the statistical evidence relied upon by plaintiffs here is entitled to little weight.

As the Fourth Circuit noted in *Woodward v. Lehman,* 717 F.2d 909, 913 n. 5 (4th Cir.1983), statistical evidence of the sort involved here may be important in resolving a claim of discrimination in hiring, "but it plainly was not pertinent to charges of individual acts of discrimination against employees already employed." In that case, the Fourth Circuit affirmed findings of the district court in a Title VII disparate treatment action brought by two black employees of the Charleston Navy Yard. Both plaintiffs claimed that they had been denied promotions by the Navy because of their race. The district court findings that both had not made a *prima facie* showing of discrimination were affirmed on appeal.

For these reasons, even if this Court were to follow *Davis v. Califano, supra,* the statistical evidence presented by the plaintiffs in this case would not be sufficient to establish a *prima facie* case of employment discrimination by the defendant. Both the figures themselves and the inferences derived from them by counsel for the plaintiffs are fatally flawed.

## IV

### Conclusion

For the reasons stated, this Court finds and concludes that neither plaintiff has proved that the defendant intentionally discriminated against him on account of his race. Accordingly, judgment is hereby entered in favor of the defendant against each plaintiff, with costs.

---

**10.** From 1971 to 1978, Aberdeen Proving Ground lost almost 600 jobs.