**Doris M. DAVIS, Plaintiff,**

v.

**RICHMOND, FREDERICKSBURG AND POTOMAC RAILROAD COMPANY, Defendant.**

**Sandra Jean HYLTON, Plaintiff,**

v.

**RICHMOND, FREDERICKSBURG AND POTOMAC RAILROAD COMPANY, Defendant.**

Civ. A. Nos. 84–0255–A, 84–0211–A.

United States District Court,
E.D. Virginia,
Alexandria Division.

Aug. 30, 1984.

As Corrected Sept. 12, 1984.

Alan Rosenblum, Rosenblum & Rosenblum, Alexandria, Va., for Hylton and Davis.

Kenneth Labowitz, Alexandria, Va., for Hylton.

Fred C. Alexander, Jr., Alexandria, Va., for defendant.

## MEMORANDUM OPINION

RICHARD L. WILLIAMS, District Judge.

I. *Findings of Fact*

A. Introduction

1. Plaintiffs Doris M. Davis and Sandra Jean Hylton are white female employees of the Defendant who currently reside in Virginia.

2. Defendant Richmond, Fredericksburg, and Potomac Railroad ("RF & P") is a Virginia corporation operating a mainline railroad between the Potomac River, Northern Virginia, and Richmond (approximately 100 miles). As of June, 1983, it had 843 employees of whom 340 were employed at its Alexandria, Virginia facility, Potomac Yard, and 503 were employed at its Richmond, Virginia facility, Acca Yard. The Defendant is engaged in an industry affecting commerce and is an employer as defined in 42 U.S.C. § 2000e(b).

3. On April 1, 1983, Ms. Davis and Ms. Hylton filed charges of discrimination with the EEOC alleging that Defendant RF & P had discriminated against them because of their sex in denying them entrance into Defendant's apprentice locomotive engineer program. After investigation, but without making any determination, the EEOC issued its Notice of Right to Sue to each Plaintiff. Ms. Davis filed her action in this Court on March 15, 1984. Ms. Hylton filed her action on March 1, 1984.

4. On August 22, 1984, the liability phase of this case was tried to the Court. The damages phase of the case will be set for trial at a future date.

B. The Position of Locomotive Engineer

1. A locomotive engineer is principally responsible for the operation and handling of the train. The engineer remains in the locomotive cab and performs the operations needed for the handling and performance of the train. The engineer must be knowledgeable of all operating, traffic and safety rules and must be able to coordinate information received from the conductor, trainmaster, dispatcher, or yardmaster. *See* Testimony of Mr. McGinley; Mr. Decker.

2. The position of locomotive engineer is a position of prestige and relatively high pay among the non-managerial workers. *See* Testimony of Ms. Davis; Ms. Hylton.

3. At no time prior to the institution of this suit has Defendant RF & P employed a woman as a locomotive engineer in either of its facilities. *See* Answer to Interrogatory 22. As of the date of this trial, no women had entered the locomotive engineer apprenticeship program established by Defendant RF & P in its Memorandum of Agreement between the Defendant and the Brotherhood of Locomotive Engineers, effective June 1, 1972. *See* Answer to Interrogatory 22; Plaintiffs' Exhibit 1.

4. It is undisputed by the parties that the position of locomotive engineer does not require any extraordinary physical capabilities in order to perform the necessary duties. No gender related physical requirements limit the position of locomotive engineer to one sex or the other. *See* In Court Stipulation of the Parties; Testimony of Mr. Decker.

5. The duties of a locomotive engineer require specific training. However, while prior experience with the operation of locomotive engines and the railroad system it-

self may be helpful, such prior experience is not necessary in order to produce a competent locomotive engineer. The relationship between prior experience with the railroad and competency as a locomotive engineer is nil. While it may be easier to teach an individual with knowledge of the railroad and the lay of the tracks, the training program for such individuals is not substantially different or more expensive from that for individuals without any prior knowledge. *See* Testimony of Mr. Decker.

6. Both parties agree that the Plaintiffs in this action are capable of being trained to be locomotive engineers for Defendant RF & P.

7. It is undisputed that women have been relegated to low paying clerical jobs in the railroad industry in general. *See* Plaintiffs' Exhibit 4. Defendant RF & P does not contend that it is unique in this regard. *See* Defendant's Exhibit 5.

C. The Employment Process in Richmond and Alexandria—In General

1. Defendant RF & P operates two railyards: one in Richmond, Virginia (Acca Yard); and one in Alexandria, Virginia (Potomac Yard).

2. Both yards are governed by the Agreements, Rules & Rates of Pay between the Richmond, Fredericksburg, and Potomac Railroad Company and the Brotherhood of Locomotive Engineers (representing the employees of Defendant RF & P) which created the apprentice locomotive engineer program. *See* Plaintiffs' Exhibit 2, Addendum 2(a). Both yards are also governed by the Seniority Modification Agreement, the purpose of which was to improve the opportunities for certain female employees, including female clerks. This agreement was entered into by the National Carriers' Conference Committee (representing RF & P) and the Brotherhood of Railway, Airline and Steamship Clerks (representing the employees of those railroads), dated November 6, 1975. *See* Plaintiffs' Exhibit 2.

3. Through 1972, all locomotive engineers were covered by the same seniority list whether they were employed at Potomac or at Acca Yard. After 1972, separate seniority lists were maintained for the two yards. Any engineer transferring from one yard to the other would lose all of the seniority he had accrued at his original yard. Both yards are covered by the same union agreement. *See* Plaintiffs' Exhibit 2.

4. While there are many similarities in the hiring procedures utilized by the two yards, actual hiring criteria and decisions are made separately.

5. The hiring process at Potomac Yard in Alexandria, Virginia is as follows:

a. Potomac Yard is a freight classification and forwarding yard. It is owned by Defendant RF & P, but is operated under a contract with six railroads (including RF & P) who are tenants of the Defendant. The Superintendant of Potomac Yard, Mr. John F. McGinley, is an employee of Defendant RF & P who reports to the Board of Managers for the Yard. *See* Testimony of Mr. McGinley.

b. Mr. McGinley holds absolute discretion to hire those whom he believes to be qualified to be trained as locomotive engineers. *See* Testimony of Mr. McGinley.

c. Once Mr. McGinley determines that there is a need for a new locomotive engineer, he consults his trainmaster, Mr. Phelan Tyler, for recommendations. Mr. McGinley did not limit Mr. Tyler's recommendations to those who had in some way indicated an interest in the position. *See* Plaintiffs' Exhibit 10. Mr. McGinley has unfettered discretion to choose the individual to fill the job opening. *See* Testimony of Mr. McGinley.

d. It is not the practice or procedure of anyone working for Defendant RF & P at Potomac Yard to post any kind of notice regarding the availability of a position. In addition, it is not the practice or procedure of anyone working for Defendant RF & P at Potomac Yard to reduce to writing a list of the qualifications necessary to obtain positions at the Yard, including that of locomotive engineer. *See* Testimony of Mr. McGinley.

e. There is no formal application procedure at Potomac Yard. Instead, Mr. McGinley has always relied on word of mouth as the principal means of recruitment. He has consistently received more applications than he has had openings from this informal process. *See* Testimony of Mr. McGinley.

f. There is no process whereby applicants for the position of locomotive engineer are tested individually for their ability or aptitude to perform. *See* Testimony of Mr. McGinley.

g. Mr. McGinley stated that he looks for the following criteria in selecting a locomotive engineer: regular work record without absenteeism; alertness to safety needs; knowledge of a locomotive generally through jobs as carman, brakeman, or maintenance man. Date of application and date of seniority with Defendant RF & P are not factors considered by Mr. McGinley. *See* Testimony of Mr. McGinley.

h. No individual with a clerical background has ever been selected to train for the position of locomotive engineer by a Superintendant at Potomac Yard. However, of the five clerks who submitted applications for apprentice engineer training from 1972 to 1979 (two males and three females), Judy Fultz and Dean Poole were recommended for the job. Ms. Fultz was never offered the job of apprentice locomotive engineer because she indicated that she was no longer interested in the position. *See* Testimony of Mr. McGinley.

6. The hiring process at Acca Yard in Richmond, Virginia is as follows:

a. Mr. J.D. Doswell, Superintendent for Transportation for RF & P, and Mr. Samuel L. Hudson, Trainmaster and Road Foreman, have total discretion to fill openings for locomotive engineers. The central personnel office for Defendant RF & P maintains a list of those interested in the position of locomotive engineer. Once an opening arises, Mr. Hudson screens the "applications" that have been submitted and makes recommendations to Mr. Doswell. Mr. Doswell has complete discretion to select an applicant. *See* Testimony of Mr. Hudson.

b. It is not the practice or procedure of anyone working for Defendant RF & P at Acca Yard to post any kind of notice regarding job openings. In addition, it is not the practice or procedure of Defendant RF & P to reduce to writing the qualifications necessary to obtain positions at Acca Yard, including that of locomotive engineer. *See* Testimony of Mr. Hudson.

c. There is no process whereby applicants are tested individually for their ability or aptitude to perform the duties of a locomotive engineer. *See* Testimony of Mr. Hudson.

d. Since 1973, Mr. Hudson and Mr. Doswell have chosen to fill locomotive engineer openings primarily from the ranks of locomotive engineers at other railroads. In 1983, Mr. Doswell and Mr. Hudson hired their first in-house apprentice locomotive engineer since 1973, Mr. J.A. Sizer. *See* Answer to Interrogatory 22.

e. In hiring Mr. Sizer, Mr. Hudson and Mr. Doswell looked for the following criteria: train service experience, and a good prior work and discipline record. *See* Testimony of Mr. Hudson.

f. No clerical personnel have ever been selected for positions as apprentice locomotive engineers for the Acca Yard in Richmond. *See* Answer to Interrogatory 22.

g. It is uncontradicted that in 1979, Mr. Doswell told W.P. Cunnane, Road Conductor and Local Chairman of the United Transportation Union for Defendant RF & P, that he would not consider women for locomotive engineer positions as long as he was supervisor. *See* Testimony of W.P. Cunnane.

D. Defendant RF & P's Denial of the Position of Apprentice Locomotive Engineer to Each of the Plaintiffs

1. Plaintiff Doris M. Davis

a. Plaintiff Davis has been employed by Defendant RF & P at Potomac Yard since 1943. Since 1944, she has been employed as a clerk in the mechanical department.

She has good work and discipline records. *See* Testimony of Ms. Davis; Mr. McGinley.

b. In 1976, Ms. Davis made a written application to the Richmond personnel office for the position of apprentice locomotive engineer. While there has been some testimony to the contrary, this Court finds that at no time since 1976 did Plaintiff Davis request that her name be removed from consideration for the apprentice locomotive engineer post. *See* Testimony of Ms. Davis; Mr. McGinley.

c. Superintendent McGinley spoke to Ms. Davis regarding her interest in a position as apprentice locomotive engineer several times. Each time, he pointed out the negative aspects of the job for Ms. Davis. *See* Testimony of Ms. Davis; Mr. McGinley.

d. Plaintiff Davis has never been offered the position of apprentice locomotive engineer. *See* Testimony of Ms. Davis; Mr. McGinley.

e. At no time up until the institution of this lawsuit, was Ms. Davis informed of any specific skills or experience necessary to obtain the position of apprentice locomotive engineer. *See* Testimony of Ms. Davis.

f. Since 1976, twenty-five males have become locomotive engineers at Potomac Yard. *See* Answer to Interrogatory 22.

2. Plaintiff Sandra Jean Hylton

a. Plaintiff Hylton has worked for Defendant RF & P at Acca Yard since December, 1971. She has held several different positions within the clerical classification in the approximately thirteen years that she has been employed by the Defendant. She was a keypunch operator, the first female yard clerk, one of the first female crew dispatchers, and the first female train dispatcher. Presently, she is employed as a utility relief clerk. As such, she is called upon to relieve yard clerks, crew dispatchers, and the train dispatchers who are on vacation. *See* Testimony of Ms. Hylton.

b. Plaintiff Hylton applied in Richmond for training as an apprentice locomotive engineer in November, 1975. *See* Testimony of Ms. Hylton.

c. During the interview process which resulted in the hiring of Mr. Sizer as an apprentice locomotive engineer, Ms. Hylton reminded Mr. Hudson of her interest in the position of apprentice locomotive engineer. *See* Testimony of Ms. Hylton; Mr. Hudson.

d. After informing her that she would be considered for the job, Mr. Hudson never considered Ms. Hylton for the position. *See* Testimony of Mr. Hudson.

e. Plaintiff Hylton has never been offered the position of apprentice locomotive engineer. *See* Testimony of Ms. Hylton.

f. At no time up until the institution of this lawsuit was Ms. Hylton informed of any specific skills, such as those acquired in train service, needed to obtain the position of apprentice locomotive engineer. *See* Testimony of Ms. Hylton; Mr. Hudson.

g. During this time period, no promotions or transfers were made into train service with the Defendant. In fact, some train service personnel were laid off. *See* Testimony of Mr. Hudson.

h. Seventeen males have seniority dates later than 1975 as locomotive engineers in Acca Yard. One of the seventeen was hired without prior experience. *See* Answer to Interrogatory 22.

II. *Conclusions of Law*

A. Introduction

1. Jurisdiction in this Court is based on 28 U.S.C. § 1331. The Plaintiffs have brought suit against the Defendant under 42 U.S.C. § 2000e–2(a). Defendant RF & P is an employer within the meaning of 42 U.S.C. § 2000e(b). The Plaintiffs have complied with the statutory prerequisites of bringing this suit as set forth in 42 U.S.C. § 2000e–5(g).

2. The Plaintiffs have asserted two alternate theories of Title VII liability, disparate impact and disparate treatment. Claims of disparate impact may be distinguished from those of disparate treatment. The former involve employment practices

that are facially neutral in their treatment of different groups but adversely affect one group more than another and cannot be justified by a business necessity. Proof of discriminatory intent is not necessary. In contrast, disparate treatment involves distinct actions by an employer which treat certain people less favorably than others based on their race, color, national origin, religion, or sex. Discriminatory intent is an essential element of proof. *See International Brotherhood of Teamsters v. United States, et al.*, 431 U.S. 324, 335, n. 15, 97 S.Ct. 1843, 1854, n. 15, 52 L.Ed.2d 396 (1977).

For reasons stated in more detail below, the Court has determined that Defendant RF & P is liable on both Title VII theories. The Court will deal with disparate impact analysis first.

B. Disparate Impact Analysis

 In order to establish liability under a disparate impact theory, the Plaintiffs must prove that an employment policy or practice which appears to be neutral on its face imposes a disproportionate burden on a group protected under Title VII as compared to a favored group within the total set of persons to whom it is applied. *Griggs v. Duke Power Co.*, 401 U.S. 424, 430, 91 S.Ct. 849, 853, 28 L.Ed.2d 158 (1971); *Wright v. National Archives & Records Service*, 609 F.2d 702, 711 (4th Cir.1979). To demonstrate that the Defendant utilizes such a policy or practice, the Plaintiffs must prove the existence of more than a few isolated acts of discrimination. They must show by a preponderance of the evidence that the policy or practice constitutes the Defendant's "standard operating procedure." *International Brotherhood of Teamsters v. United States, et al., supra* 431 U.S. at 336, 97 S.Ct. at 1855. After the Plaintiffs have established such a prima facie case, the Defendant may escape liability by showing a business necessity as justification for the challenged poli-

cy. *See Id.* at 335, 97 S.Ct. at 1854; *Mitchell v. Board of Trustees of Pickens County School District*, 599 F.2d 582, 587 (4th Cir.1979); *Sledge v. J.P. Stevens & Company, Inc.*, 585 F.2d 625, 635–636 (4th Cir. 1978).

 The Plaintiffs have pointed to three factors to prove that Defendant RF & P is liable for violating Title VII under a disparate impact theory. First, the plaintiffs have established statistically that women do not have access to the higher paying, more prestigious jobs available in the railroad industry, like that of locomotive engineer.[1] Women holding positions with Defendant RF & P are usually categorized as clerical. *See* Findings of Fact, The Position of Locomotive Engineer (B). Even though no gender related requirements restrict the position of locomotive engineer to males, no woman has ever held that position at Defendant RF & P. *See* Findings of Fact, The Position of Locomotive Engineer (B). Since Plaintiff Davis formally applied for the position of apprentice locomotive engineer, twenty-five males and zero females have become locomotive engineers at Potomac Yard. Similarly, since Plaintiff Hylton indicated her interest in the apprentice locomotive engineer position, seventeen males and zero females have become locomotive engineers at Acca Yard. *See* Findings of Fact, Defendant RF & P's Denial of the Position of Apprentice Locomotive Engineer (D).

 Second, the Plaintiffs have identified certain specific practices and general policies that have led this Court and other Courts to determine that discrimination exists. Defendant's lack of an official application form, its failure to formally notify employees of job openings, its exclusive use of word of mouth recruiting and hiring procedures are discriminatory practices due to their tendency to perpetuate the all-male composition of higher prestige, better pay-

---

1. The Court notes that more men than women have applied for the position of apprentice locomotive engineer. *See* Plaintiffs' Exhibit 7. This fact does not change the Court's analysis since

the failure of women to formally apply for these positions is due more probably than not to the informal application and hiring process utilized by the Defendant. *See infra.*

ing jobs. *See* Findings of Fact, The Employment Process in General (C). Such policies favor male employees who already hold the more sought after jobs and their friends since female employees may not know about the job opening, the qualifications "preferred" for the job, or the individuals making the "recommendations" for the position. *See Barnett v. W.T. Grant Company,* 518 F.2d 543, 549 (4th Cir.1975); *Brown v. Gaston County Dyeing Machine Company,* 457 F.2d 1377, 1383 (4th Cir. 1972). In addition, Defendant RF & P has not established any objective guidelines for hiring or promoting individuals to the position of locomotive engineer. *See* Findings of Fact, The Employment Process in General (C). Nonobjective hiring standards are suspect because of their capacity to mask the use of biases that violate Title VII. *See Barnett, supra* at 550. Finally, Defendant RF & P has left the hiring of locomotive engineers entirely to the discretion of a few male supervisors. *See* Findings of Fact, The Employment Process in General (C); *Sledge v. J.P. Stevens, supra* at 635. These practices and policies go far in explaining the small number of female applicants for Defendant RF & P's higher prestige jobs and the even smaller number of successful applicants.

■ Third, the Plaintiffs have stressed one individual instance of discrimination. According to an uncontradicted statement, Mr. Doswell, Defendant RF & P's Superintendent of Transportation, stated categorically that women would never be hired as locomotive engineers as long as he was supervisor. *See* Findings of Fact, The Employment Process in General (C). Plaintiffs' statistical evidence, their proof of Defendant's discriminatory hiring practices, and Mr. Doswell's statement establish a strong case of discrimination prohibited by Title VII.

Defendant RF & P argues that its absence of female locomotive engineers and its informal hiring practices are the result of business necessities. The Defendant contends that its lack of female locomotive engineers is due to its preference for hiring engineers previously trained by other railroads or in-house employees with train service experience (Acca Yard) and its preference for hiring apprentice engineers from in-house employees with some knowledge of locomotives (Potomac Yard). According to Defendant RF & P, women have not been interested in holding the jobs it considers prerequisites to the position of locomotive engineer. Furthermore, the Defendant claims that it has never needed to formalize its hiring and promotion procedures because it has always had more applicants than job openings.

■ The Defendant has failed to carry its burden of proof in establishing a business necessity defense. The relationship between prior experience with the railroad and competency as a locomotive engineer is nil. While it may be easier to teach an individual with knowledge of the railroad, the training program for such individuals is not substantially different or more expensive from that for individuals without any prior experience. *See* Findings of Fact, The Position of Locomotive Engineer (B). Furthermore, the qualifications necessary for the job of apprentice locomotive engineer differ according to the superintendent doing the hiring. *See* Findings of Fact, The Employment Process in General (C). They have never been put in writing for all to see and to question. Therefore, it is impossible to determine what experience, if any, is actually a prerequisite to obtaining a position as locomotive engineer for Defendant RF & P. In addition, it is difficult to understand how the Defendant's informal hiring process could be the result of a business necessity since it does not guarantee that the best individuals for the job will apply or be chosen. Due to the failure of Defendant RF & P to post notices of job opportunities, it is impossible to insure that all RF & P employees—not just those with the right friends—are aware of their various career options. The Defendant's informal application and recruiting procedure along with its failure to post notices of job openings and to publicize the qualifications necessary to obtain these positions has

made it extremely difficult for individuals who are talented but not "in the know" (in this case, women) to plan their careers in such a way as to put themselves in line for high prestige jobs with Defendant RF & P.

Due to the Plaintiffs' evidence of discrimination on the part of Defendant RF & P through its disparate impact analysis and Defendant RF & P's failure to establish a business necessity defense, the Court concludes that Defendant RF & P has engaged in actions that constitute violations of Title VII.

## C. Disparate Treatment Analysis

 In a disparate treatment case, the burden of persuasion of a violation, including the element of discriminatory intent, remains on the Plaintiffs. *Wright v. National Archives & Records Service, supra* at 714. The *McDonnell Douglas* formula for proof of a prima facie case of disparate treatment governs here. *See Wright v. National Archives & Records Service, supra* at 715, n. 15. Consequently, the Plaintiffs must establish (1) that they belong to a protected group as defined by Title VII; (2) that they sought and were qualified for a position to which jobs were being offered to persons of their qualifications; (3) that despite their qualifications, they were rejected; and (4) that, after their rejection, the positions remained available to others of their qualifications. *McDonnell Douglas Corporation v. Green,* 411 U.S. 792, 802–806, 93 S.Ct. 1817, 1824–1826, 36 L.Ed.2d 668 (1973). Absent a valid explanation, statistical proof of a substantial sexual imbalance in the Defendant's work force is "often a telltale sign of purposeful discrimination." *International Brotherhood of Teamsters v. United States, et al. supra* 431 U.S. at 340, n. 20, 97 S.Ct. at 1857, n. 20; *United States v. County of Fairfax, Virginia,* 629 F.2d 932, 939 (4th Cir.1980). Statistics can establish a prima facie case even without a showing of spe-

cific instances of overt discrimination. *United States v. County of Fairfax, Virginia, supra* at 939. Once the Plaintiffs establish their prima facie case, the Defendant may dispel the presumption or inference of discriminatory conduct through evidence of non-discriminatory reasons for its actions. *McDonnell Douglas Corporation v. Green, supra,* 411 U.S. at 802–806, 93 S.Ct. at 1824–1826. The Court must determine whether the Defendant's proof presents a legitimate, non-discriminatory basis for its actions. If the Defendant has met its burden, the Plaintiffs are given an opportunity to demonstrate that the "proffered justification is merely a pretext for discrimination." *Furnco Construction Corporation v. Waters,* 438 U.S. 567, 576, 98 S.Ct. 2943, 2949, 57 L.Ed.2d 957 (1978); *Wright v. National Archives & Records Service, supra* at 714.

 In the instant case, the Plaintiffs have satisfied their burden of proof in establishing a prima facie case of disparate treatment. The Plaintiffs are women, and as such fall within a group protected by Title VII. They both applied for the position of apprentice locomotive engineer and could have successfully carried out the duties of the position.[2] It is undisputed that the Plaintiffs were never offered the position of locomotive engineer and that males without any previous experience as locomotive engineers received the jobs. *See* Findings of Fact, Denial of Position of Apprentice Locomotive Engineer (D). Finally, the Plaintiffs have demonstrated statistically a substantial sexual imbalance in the filling of the Defendant's higher prestige, better paying positions. *See* Findings of Fact, The Position of Locomotive Engineer (B).

 Defendant RF & P contends that its decision to hire men as apprentice locomotive engineers was based on its prefer-

---

**2.** While it is true that Plaintiff Davis may have developed some medical problems that preclude her from performing the duties of a locomotive engineer, the Court refrains from dealing with this issue at the liability phase of trial, since it is undisputed that Ms. Davis would not have received the position that she sought even if she did not have any health problems. *See* Defendant's Exhibit 6.

ence for individuals with some locomotive experience (Potomac Yard) or train servicé experience (Acca Yard). *See* Findings of Fact, The Employment Process in General (C). The Court holds as a matter of law that the Defendant's justification is pretextual and therefore does not dispel the presumption of discriminatory conduct that arises from the Plaintiffs' prima facie case. According to the uncontradicted testimony of the Plaintiffs' expert, Mr. David Decker, there is no relationship between prior railroad experience and competency as a locomotive engineer. *See* Findings of Fact, The Position of Locomotive Engineer (B). Furthermore, the training program for experienced individuals is not substantially different or more expensive from that for inexperienced applicants. *See* Findings of Fact, The Position of Locomotive Engineer (B). In addition, the Defendant has never established formal objective qualifications for the position of locomotive engineer. *See* Findings of Fact, The Employment Process in General (C). As a result, the Plaintiffs, who are not employed in jobs from which apprentice locomotive engineers are chosen, have never been told the route by which they could be seriously considered for the position of apprentice locomotive engineer. *See* Findings of Fact, Denial of the Position of Apprentice Locomotive Engineer (D). In fact, the precise experience preferred differs between the Richmond and Alexandria Yards. *See* Findings of Fact, The Employment Process in General (C). Moreover, Defendant's informal application, hiring, and recruitment procedures combined with the fact that a few male supervisors hold absolute discretion to make the final hiring decision permit Defendant RF & P to continue filling its more prestigious job openings with men. *See* Findings of Fact, The Employment Process in General (C). Finally, Mr. Doswell's statement in 1979 that women would never be considered for engineer positions buttresses the Court's finding of discriminatory treatment in violation of Title VII on the part of Defendant RF & P.