**Glenn E. TAGATZ, Plaintiff,**

v.

**MARQUETTE UNIVERSITY, Defendant.**

No. 82–C–812.

United States District Court, E.D. Wisconsin.

Feb. 29, 1988.

Mark J. Rogers, Angermeier & Rogers, Milwaukee, Wis., for plaintiff.

John G. Hill, Jr., Gen. Counsel, Milwaukee, Wis., for defendant.

## DECISION

WARREN, Chief Judge.

This discrimination action was filed on July 2, 1982. This case has almost become tenured in the Court. Plaintiff, Glenn E. Tagatz is a professor for defendant, Marquette University, and alleges that Marquette unlawfully discriminated against him in the following areas:

1. Between 1975 to 1985, Marquette discriminated on the basis of religion in the setting of salaries,

2. Between 1976 and 1981, Marquette discriminated on the basis of age in the setting of salaries,

3. Marquette discriminated on the basis of providing fringe benefits to Jesuits,

4. Marquette discriminated on the basis of age and sex in the scheduling of sabbaticals, and

5. Marquette's requirement that professors teach Catholicism is an unlawful condition of employment.

Tagatz also alleged that Marquette discriminated on the basis of religion when it filled the position of dean for the School of Education because it limited its search to Jesuits. This Court granted summary judgment to Marquette University on the position of dean issue because Marquette was entitled to discriminate on the basis of religion when filling the position for dean. A trial to the Court was held on the five remaining issues and after hearing and carefully considering the testimony adduced at trial, examining with care the exhibits, and after applying the relevant statutory and judicial authority, and Court hereby renders its findings of fact and conclusions of law.

## I. FINDINGS OF FACT

Plaintiff, Dr. Glenn Tagatz, a male, Episcopalian by religion, and born 1-27-34, received a Ph.D. in educational psychology from the University of Wisconsin–Madison in 1963. Plaintiff was hired as an associate professor in the School of Education by defendant Marquette University in 1968. He received tenure in 1970, was promoted to full professor in 1981, and served as a department chairman from 1971 to 1974.

Plaintiff is an expert in statistics and measurement. He has served as a consultant numerous times and as an expert witness in discrimination lawsuits. He has taught measurement and statistics courses.

Plaintiff is also an expert in the analysis of the validity of merit systems used for hiring, licensure and other employment decisions for purposes of compliance for Title VII of the Civil Rights Act of 1964. Many of plaintiff's consultancies involved the use of his expertise in this area including a number of consultancies with state governments.

Defendant Marquette University, is an institution of higher education, constituted under the laws of the State of Wisconsin, located in Milwaukee, Wisconsin.

On June 1, 1971, the plaintiff was appointed Chairman of the Department of Psychology in the School of Education.

On July 15, 1974, the plaintiff was removed from this Chairmanship by Dr. Edward D. Simmons, Vice President for Aca-

demic Affairs, because of tension within the School.

### A. Statistics

#### 1. *Religion*

Plaintiff's case consisted primarily of statistical evidence compiled by the plaintiff himself. Tagatz found that by rank, the Catholics as a group received greater average yearly raises than non-Catholics for 1975 to 1985. The distribution by rank was statistically significant because the probability that the ranking would place Catholics versus non-Catholics on this distribution simply by chance (that is, without the factor of Catholicity making a difference) is less than one in one-hundred.

Tagatz also found that using the statistical technique of Analysis of Variance (ANOVA) there is a statistically significant difference between the yearly average salary increases awarded to Catholics versus non-Catholics such that the probability of this variance occurring by chance is less than .0048.

Tagatz then took the salaries of five Catholic and five non-Catholic professors who have been continuous employees since 1969 and developed the following graph demonstrating the average salary of each group for each year:

MEAN SALARIES PAID

The following graph was developed demonstrating the differences between the five Catholics' average salaries who have been continuous employees since 1969 and the five non-Catholics' average salaries who have been continuous employees since 1969:

## DIFFERENCES BETWEEN MEAN SALARIES

### 2. *Age*

Regarding the claim of age discrimination, Tagatz found that there is a statistically significant difference in the average salaries awarded to faculty over forty versus those under forty such that the probability of this variance occurring by chance is less than .05.

Applying a Chi–Square analysis of a ranking of professors by average percentage of salary increase for 1976 to 1981 shows that there is a statistically significant difference in the percentages between those over forty versus those under forty because the probability of these percentages occurring by chance is less than .05. The following graph demonstrates the year-by-year differences in the average salaries between the age groups:

## MEAN PERCENTAGE INCREASES OF OVER 40 VS. UNDER 40

— ● OVER 40　　　　　　　　　— - ● UNDER 40

YEAR

---

By use of ANOVA or Chi–Square, Tagatz found a statistically significant difference in the average percentage of salary increases awarded to those under forty versus those over forty for 1977 to 1981.

### 3. *Conclusions*

Based upon the above analyses, Tagatz concluded that a faculty member's status as a Catholic versus being a non-Catholic was a factor in the setting of salaries during 1975 to 1985. Likewise, Tagatz also concluded that being under forty versus being over forty was a factor in the setting of salaries for those persons in the Marquette University School of Education faculty during 1976 to 1981.

### B. Other Evidence

Dr. Nordberg, a Catholic, served as Dean of the School of Education from 1975 to 1981, and as such was principally responsible for setting salaries which were subject then to review and occasional change by the academic vice-president, Dr. Simmons. Dr. Nordberg was succeeded as dean by Father Hennessey, a Jesuit priest, also a Catholic, who served in this post in 1981 to 1986.

During a faculty meeting in September of 1979, Dean Nordberg told faculty members that when he had set salaries for academic year 1979–80 he had given greater increases to junior in rank faculty members because of their greater productivity.

Dr. Ivanoff testified that Dr. Nordberg had favored younger faculty members in committee assignments as well during this time period.

Dr. Nordberg made a statement to Dr. Sargent approximately mid-way through her term at Marquette University (1972–77) that she should not wear her Eastern Star ring—a ring signifying membership in a Masonic-type organization. Nordberg testified that such a statement would have been an improper comment on a religious matter and at trial denied that he made it. Nordberg stated, however, that he may have commented on the ring. Nordberg also stated to faculty members his directive that Catholic doctrine should be taught to the extent possible "in every course," in a Report for External Evaluation, Spring, 1980, sent to faculty by memo, dated November 27, 1979.

On January 26, 1976, Dr. Robert B. Nordberg, Dean of the School of Education, advised the faculty by memorandum that all increases would be on the merit principle. Dean Nordberg in this communication also offered to talk with any faculty member who felt their raise was inappropriate.

Communications similar to that described above were sent by Dean Nordberg to the faculty each year that he was Dean. The merit principle utilized by Marquette evaluated faculty in the categories of teaching, research and service.

In evaluating faculty for raises, Dean Nordberg developed a FACULTY PRODUCTIVITY REPORT, which reflected the record of faculty in the academic years 1974/75 through 1978/79. Dean Nordberg related that he considered this data when reviewing scholarship performance.

In evaluating faculty performance in the service category, Dean Nordberg took into account, among other things, service within the school as well as for outside groups. In assessing the plaintiff's performance in the service category, Dean Nordberg took into account his activities which detracted from the orderly operations of the school. These include the following:

a) On April 30, 1976, and May 11, 1986, Dean Nordberg wrote to the plaintiff criticizing him for not following channels in regard to the preparation of a new handbook for doctoral students.

b) On November 17, 1970, the plaintiff wrote directly to Father Raynor regarding tenure for a faculty member. Vice President Simmons replied to this letter criticizing plaintiff for not following channels.

c) On September 21, 1977, plaintiff wrote directly to Vice President Simmons complaining about his parking arrangements.

d) On another occasion in 1979, the plaintiff angrily presented the Dean with a parking ticket and directed him to take care of it.

e) In September 1978, Dean Nordberg appointed the plaintiff to a committee which would have the responsibility to appoint other faculty to the various committees of the School of Education. The plaintiff neglected to perform his obligations on this committee and thereby caused its dissolution.

f) The plaintiff refused to file a faculty activity report for 1978/79 despite being directed to do so by the Dean.

g) On January 22, 1980, plaintiff failed to appear for registration as was required giving only about one-hour's notice for this neglect.

h) On November 1, 1979, a graduate student by the name of John Palmer wrote to the University Board of Graduate Studies complaining of improper pressures placed upon him by the plaintiff in order to get him to take plaintiff's side in a dispute with Dean Nordberg. John Palmer conveyed the substance of this communication to Dean Nordberg.

At various times from 1976 to date, the plaintiff has been subject to student evaluations. These student evaluations show that on two occasions the plaintiff's score has been the lowest in the faculty of the School of Education.

Plaintiff's student evaluations were markedly inconsistent and generally lower than the rest of the faculty during this period.

Additionally, two former students, Ruth MacBrier and JoAnne Caldwell, testified that during courses Tagatz taught in 1984, Tagatz's performance as a professor was poor. For example, MacBrier testified that essentially Tagatz failed to teach four classes. Two of the classes were not held, and two were only taught for a half hour and during the half hour, Tagatz was hyper, he had slurred speech, and he was unable to keep his thoughts on the class. Additionally, MacBrier felt that course material was not covered. Caldwell testified that during the class, Tagatz would take mid-breaks that lasted longer and longer, and on one or two occasions, he cancelled class after the break. There was no mid, final, project or quiz in the class; the only requirement was to attend. Essentially, according to Caldwell, the students taught the class.

The program for sabbatical leaves at Marquette University was instituted in the academic year 1975/76 and the academic Vice President directed that sabbatical years be assigned in accordance with individual faculty date of appointment.

All of the faculty in the School of Education receiving a sabbatical appointment prior to the plaintiff had an appointment date prior to Tagatz's:

| Year | Person | Appointment Date |
|------|--------|------------------|
| 1976–77 | Houston | 1963 |
| 1977–78 | Bogenschild, Dupuis | 1963, 1957 |
| 1978–79 | Thompson, Collins | 1967 |
| 1979–80 | Ivanoff | 1966, 1960 |
| 1980–81 | Nader, Topetzes | 1953 |
| 1981–82 | Tagatz, Steeves | 1968 |

## II. MOTION TO STRIKE

Tagatz has moved to strike certain portions of Marquette University's brief. Tagatz first seeks to strike the following first paragraph of Marquette's summary argument:

> The plaintiff's statistical evidence of discrimination was in the form of Hypotheses Testing. This technique is not appropriate since it lacks any causal weight. The arithmetical data is useless unless the critical variables of teaching, research and service are somehow accounted for.

The Court strikes the first two sentences of the paragraph because there was no testimony describing the evidence as Hypothesis Testing. Marquette University failed to provide *ANY* expert testimony rebutting plaintiff's statistical evidence. The last sentence will not be struck because it merely points out the weakness of plaintiff's statistics.

In its written argument, Marquette quotes and cites to treatises on statistics that were not admitted into evidence such as Ferguson, G.A., *Statistical Analysis in Psychology and Education*, 4th Ed., New York, McGraw–Hill 1976. Plaintiff argues that because they were not admitted into evidence, they were are improper argument. This Court agrees. Fed.R.Evid. 803(18) provides that learned treatises are excluded by the hearsay rule unless they are called to the attention of an expert witness or relied upon by the witness. There is no basis for the use of the treatises cited by Marquette in its closing argument, and accordingly, the Court hereby strikes the references to the treatises which were not admitted into evidence.

Tagatz also seeks to strike Marquette's argument relating to religious discrimination because it allegedly is an attack on the plaintiff's statistics without the presentation of expert testimony on the issue. This Court does not agree. The type of calculations provided by Marquette in its argument are simple mathematical calculations which are derived from the numbers put into evidence by plaintiff. The Court DENIES the motion to strike this section.

Tagatz also seeks to strike the quotation from an affidavit of Quentin Quade which was submitted in support of the motion for summary judgment. The affidavit is in the record and this Court relied on it for its summary judgment decision. Also, this was a trial to the Court. The argument using the affidavit will not be stricken.

Finally, Tagatz objects to Marquette's reference to the Jesuit's vow of poverty. The evidence in the record shows that the Jesuits return their salaries to Marquette. Accordingly, the conclusion can be drawn that if the University did not provide the Jesuits at Marquette with their basic needs, because they do not receive their salaries, they would have absolutely nothing. Nevertheless, there was no evidence regarding the vow of poverty and whether or not there is a vow of poverty does not affect the outcome of this case. The motion to strike is GRANTED.

Marquette has raised the issue that Tagatz's claim of disparate impact is improper because it was not properly pleaded, it is inappropriate because the suit is brought in Tagatz's individual capacity and not as a class action, Tagatz did not notify the Court or opposing counsel of the disparate treatment claim until the conclusion of the trial, and a disparate impact analysis is inappropriate for analyzing academic judgments.

First, there is no requirement which mandates that a plaintiff elect the theory under which it wishes to proceed in the pleadings. *Davis v. Richmond, Fredericksburg & Potomac R. Co.*, 803 F.2d 1322, 1327 (4th Cir.1986). Notice pleading is simply required. Secondly, several jurisdictions have recognized that a claim of disparate impact can be brought by individuals in a private, non-class action. *Craig v. Alabama State University*, 804 F.2d 682, 686 (11th Cir.1986); *Davis v. Richmond, Fredericksburg & Potomac R. Co.*, 803 F.2d 1322, 1327 n. 3 (4th Cir.1986); *Lasso v. Woodmen of World Life Ins. Co.*, 741 F.2d 1241, 1245 (10th Cir.1984), *cert. denied*, 471 U.S. 1099, 105 S.Ct. 2320, 85 L.Ed.2d 839 (1985); *Rule v. International Ass'n of Bridge, Structural and Ornamental Ironworkers*, 568 F.2d 558, 566 (8th Cir. 1977); *Accord Nash v. Consolidated City of Jacksonville*, 763 F.2d 1393, 1397 (11th Cir.1985); *Walker v. Jefferson County Home*, 726 F.2d 1554, 1557 (11th Cir.1984). Thirdly, in its opening statement, plaintiff's counsel stated that this case was being brought under both a disparate impact analysis and a disparate treatment analysis. Defense counsel should have objected to any alleged "surprise" at that point; plus, counsel had the full opportunity to present a case refuting a claim of disparate impact. Finally, there is a dispute between the parties and in some jurisdictions as to the applicability of the disparate impact analysis to subjective employment practices. Some jurisdictions have applied the impact analysis finding that "[s]ubjective practices may well be a covert means to effectuate intentional discrimination...." *Antonio v. Wards Cove Packing Co., Inc.*, 810 F.2d 1477, 1484 (9th Cir.1987). The Supreme Court has heard oral argument in *Watson v. Fort Worth Bank & Trust*, 798 F.2d 791 (5th Cir.1986), *cert. granted*, —— U.S. ——, 107 S.Ct. 3227, 97 L.Ed.2d 734 (1987) (argued January 20, 1988) on the issue of the applicability of the disparate impact theory when subjective criteria are used. Also, the Seventh Circuit has stated in a footnote the following:

> [A] disparate impact analysis may not be appropriate for faculty hiring decisions because such decisions necessarily involve many subjective factors. Disparate impact claims generally involve facially neutral criteria, such as minimum height or weight requirements or a minimum score on an objective test. We have previously noted, without deciding the issue, that a "disparate impact claim is more problematic when subjective factors are present in the decisionmaking process." The circuits are split on the issue whether a disparate impact analysis may be applied to subjective employee selection procedures.

*Griffin v. Board of Regents of Regency Univ.*, 795 F.2d 1281, 1288 n. 14 (7th Cir. 1986) (citations omitted). The Seventh Circuit has stated in an earlier case that it is difficult to review academic employment judgments because "the standards used to evaluate personnel are, in some sense, subjective and certainly defy easy measurement by objective criteria." *Davis v. Weidner*, 596 F.2d 726, 731 (7th Cir.1979). Although this Court is of the opinion that "[a] professor's value depends upon his creativity, his rapport with students and colleagues, his teaching ability, and numerous other intangible qualities which cannot be measured by objective standards," *Lewis v. Chicago State College*, 299 F.Supp. 1357, 1359 (N.D.Ill.1969), the "desire to avoid judicial intrusion into academic affairs, can lead to the immunization of higher education from the requirements of Title VII." *Davis*, 596 F.2d at 731. In the proper case, a disparate impact analysis may be appropriate, but in the present case, plaintiff's evidence does not establish a *prima facie* case of discrimination, and thus, even though the Court will apply an impact analysis, it is not convinced that the facts of this case make its application appropriate.

### III. CONCLUSIONS OF LAW

#### A. Disparate Treatment Analysis

In *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973), the Supreme Court set forth the following framework for analyzing Title VII cases:

[T]he plaintiff [first] has the burden of proving by the preponderance of the evidence a prima facie case of discrimination. Second, if the plaintiff succeeds in proving the prima facie case, the burden shifts to the defendant "to articulate some legitimate, nondiscriminatory reason for the employee's rejection." Third, should the defendant carry this burden, the plaintiff must then have an opportunity to prove by a preponderance of the evidence that the legitimate reasons offered by the defendant were not its true reasons, but were a pretext for discrimination.

A disparate treatment suit exists when plaintiff alleges that he was treated less favorably than his peers because of age and/or religion. A discriminatory intent must be proven. *Texas Dept. of Community Affairs v. Burdine*, 450 U.S. 248, 256, 101 S.Ct. 1089, 1095, 67 L.Ed.2d 207 (1981). The primary evidence in this case exists in the form of statistics. In *Hazelwood School District v. United States*, 433 U.S. 299, 307–08, 97 S.Ct. 2736, 2741, 53 L.Ed.2d 768 (1977), the Court stated that gross statistical disparities alone, "in a proper case constitute prima facie proof of a pattern or practice of discrimination." Tagatz is alleging a pattern or practice case because he alleges that Marquette has engaged in systematic discrimination of non-Catholic professors over the age of forty. In some cases, statistical evidence is probative for showing motive, intent, or purpose, and it can be probative and supportive of plaintiff's allegation. Nevertheless, this case is an *individual* disparate treatment case, and as such, the statistical evidence is less significant than in a class action because the primary issue is whether or not Tagatz was a victim of discrimination. *Krodel v. Young*, 748 F.2d 701, 710 (D.C.Cir.1984), *cert. denied*, 474 U.S. 817, 106 S.Ct. 62, 88 L.Ed.2d 51 (1985). *Opara v. Modern Mfg. Co.*, 434 F.Supp. 1040, 1044 (D.Md.1977). *Plemer v. Parsons-Gilbane*, 713 F.2d 1127 (5th Cir.1983). In fact, statistics alone cannot establish a case of individual disparate treatment. *Carmichael v. Birmingham Saw Works*, 738 F.2d 1126, 1131 (11th Cir. 1984). The Seventh Circuit has stated that

"[o]ne of the purposes of Title VII is to make persons whole for injuries suffered on account of unlawful discrimination.... [B]efore the court may award damages, plaintiff must first establish that [he] has, in fact, sustained an economic loss from defendant's discrimination." *Taylor v. Philips Industries*, 593 F.2d 783, 787 (7th Cir.1979) (per curiam).

█ In this case, it is clear that Tagatz is over the age of forty, and he is not Catholic. Beyond these two factors, however, this Court does not find that plaintiff established a *prima facie* case of age or religious discrimination. First, this Court has difficulty accepting plaintiff's statistical evidence because in the calculations, plaintiff did not specifically address individual differences which could account for differences in salaries. For example, the fact that one person was more productive than another person in publishing books or articles or that a person received very high student evaluations were not calculated. These individual characteristics should have been calculated into the figures; rather plaintiff's statistics only include age, religion and salary figures.

Secondly, plaintiff's statistics find that Catholicism and age were factors in the setting of salaries based upon percentages. Marquette in its closing argument set forth the following hypothetical argument. Professor A is thirty years old and is receiving a salary of $20,000. Professor B is fifty years old and is receiving a salary of $50,000. Each professor then receives a $1,000 raise. Applying plaintiff's percentage analysis to these numbers results in the conclusion that professor A is receiving a five percent increase while professor B is receiving a two percent increase. Tagatz thereby concludes that this is evidence of discrimination. Dr. Nordberg testified that when he gave salary increases, they were not based upon percentages, but actual dollars. Plaintiff has not presented any law which holds that it is discriminatory to base salary increases on actual dollars rather than on percentages, and this Court does not find such a basis improper.

Also, if one undertakes the simple mathematical calculation of adding each professor's salary increase for each year between 1976 and 1981 and then divide that number by the number of years during that time that they were entitled to an increase, the following average raises for each professor are derived: [1]

| Over 40 | | Under 40 | |
|---|---|---|---|
| Collins: | 1,966.67 | Raiche: | 1,750.00 |
| DeRoche: | 1,950.00 | Schmidtlein: | 700.00 |
| Dupuis: | 2,166.67 | Thom: | 2,400.00 |
| Ivanoff: | 1,616.67 | Zaffran: | 1,690.00 |
| Martin: | 3,333.33 | Bardwell: | 1,775.00 |
| Nader: | 1,233.33 | Kaiser: | 2,006.25 |
| Nordberg: | 2,305.67 | Leslie: | 1,716.67 |
| Schimoniak: | 1,425.00 | Negin: | 1,750.00 |
| Thompson: | 2,033.33 | Robinson: | 1,250.00 |
| Bogenschild: | 1,683.33 | Towle: | 1,266.67 |
| Houston: | 1,358.33 | | |
| Pambookian: | 1,050.00 | | |
| Steeves: | 2,000.00 | | |

| Over 40 | | Under 40 | |
|---|---|---|---|
| Tagatz: | 1,383.33 | | |
| Topetzes: | 1,316.67 | | |
| | 26,822.33 | | 16,304.59 |
| | 1,788.16 | | 1,630.46 |
| | 15/26,822.33 | | 10/16,304.59 |

Based on the average of the increases, the persons over forty received a higher average raise. Although in years 1980 and 1981 Tagatz received a salary that was lower than any person under the age of forty, Tagatz's increase was only $200 and it was $300 less than the lowest increase to a person under forty.

Furthermore, although Dean Nordberg admitted that he gave younger professors greater salary increases to junior faculty members because of their greater productivity, Tagatz has not shown that the faculty members were not more productive, and

1. SALARY INCREASES FOR YEARS 1976–1982 COMPARING INCREASES FOR FACULTY MEMBERS OVER 40 and UNDER 40 *

| | Year | | | | | | Sum of ÷ # of = Avg. yearly increase | | |
|---|---|---|---|---|---|---|---|---|---|
| | 76–77 | 77–78 | 78–79 | 79–80 | 80–81 | 81–82 | Sum of increase | ÷ # of yrs. | = yearly increase |
| **OVER 40** | | | | | | | | | |
| Collins | 1600 | 1500 | 1650 | 2100 | 2800 | 2150 | = 11,800 | ÷ 6 | = 1,966.67 |
| DeRoche | 1583 | 1417 | 2850 | | | | = 5,850 | ÷ 3 | = 1,950.00 |
| Dupuis | 1100 | 1500 | 1700 | 2400 | 3000 | 3300 | = 13,000 | ÷ 6 | = 2,166.67 |
| Ivanoff | 1100 | 1000 | 1300 | 1800 | 2350 | 2150 | = 9,700 | ÷ 6 | = 1,616.67 |
| Martin | | | | 4333 | 2667 | 3000 | = 10,000 | ÷ 3 | = 3,333.33 |
| Nader | 850 | 2000 | Ø | 1600 | 1850 | 1100 | = 7,400 | ÷ 6 | = 1,233.33 |
| Nordberg | 1667 | 1750 | 2000 | 2667 | 2750 | 3000 | = 13,834 | ÷ 6 | = 2,305.67 |
| Thompson | 1200 | 1400 | 1400 | 2150 | 2500 | 3550 | = 12,200 | ÷ 6 | = 2,033.33 |
| Bogenschild | 1400 | 1400 | 1450 | 2000 | 2150 | 1700 | = 10,100 | ÷ 6 | = 1,683.33 |
| Houston | 1100 | 1000 | 1100 | 1550 | 1750 | 1650 | = 8,150 | ÷ 6 | = 1,358.33 |
| Pambookian | 1050 | | | | | | = 1,050 | ÷ 1 | = 1,050.00 |
| Steeves | 1350 | 1000 | 1750 | 2200 | 2600 | 3100 | = 12,000 | ÷ 6 | = 2,000.00 |
| Tagatz | 1000 | 1300 | 1400 | 1650 | 1500 | 1450 | = 8,300 | ÷ 6 | = 1,383.33 |
| Topetzes | 850 | 950 | 1000 | 1350 | 1500 | 2250 | = 7,900 | ÷ 6 | = 1,316.67 |
| **UNDER 40** | | | | | | | | | |
| Raiche | | | | | 1750 | 1750 | = 3,500 | ÷ 2 | = 1,750.00 |
| Schmidtlein | 700 | | | | | | = 700 | ÷ 1 | = 700.00 |
| Thom | | | | | | 2400 | = 2,400 | ÷ 1 | = 2,400.00 |
| Zaffran | | 1200 | 1400 | 1400 | 1700 | 2750 | = 8,450 | ÷ 5 | = 1,690.00 |
| Bardwell | | | 1200 | 1700 | 2350 | 1850 | = 7,100 | ÷ 4 | = 1,775.00 |
| Kaiser | 1400 | 3000 | 833 | 2792 | | | = 8,025 | ÷ 4 | = 2,006.25 |
| Leslie | 1400 | 1300 | 1400 | 1800 | 2500 | 1900 | = 10,300 | ÷ 6 | = 1,716.67 |
| Negin | | 1000 | 1250 | 1600 | 2350 | 2550 | = 8,750 | ÷ 5 | = 1,750.00 |
| Robinson | | | 1250 | | | | = 1,250 | ÷ 1 | = 1,250.00 |
| Towle | 1400 | 1100 | 1300 | | | | = 3,800 | ÷ 3 | = 1,266.67 |

* Increase amounts are taken from the salaries listed on Table I of plaintiff's exhibit 18.

further, that it is discriminatory to give larger raises based on productivity. If one works hard, one should be rewarded.

Accordingly, this Court is not persuaded that plaintiff's statistics present a *prima facie* case of age discrimination.

■ As to the claim of religious discrimination, again, the Court is not persuaded that a *prima facie* case has been presented. First, individual differences such as publications and student evaluations were not presented in statistical form. Secondly, of the five non-Catholics which have been employed since 1969, only two are full professors whereas all five of the Catholics are full professors. Thus, a majority of the non-Catholic data comes from individuals of lower academic rank. If one calculates the average yearly salaries for the two full professors that are non-Catholics, Tagatz and Steeves, and compares the averages with the five Catholic full professors, the conclusion can be reached that in all years other than 1983 to 1985 the non-Catholics received higher salary increases. The following figures demonstrated that point:

| Year | Catholic | Non-Catholics |
|------|----------|---------------|
| 1969 | 14,140 | 15,825 |
| 1970 | 15,120 | 16,975 |
| 1971 | 16,124 | 18,025 |
| 1972 | 16,914 | 19,675 |
| 1973 | 17,404 | 20,050 |
| 1974 | 18,314 | 21,175 |
| 1975 | 19,956 | 22,600 |
| 1976 | 21,573 | 23,850 |
| 1977 | 22,906 | 25,025 |
| 1978 | 24,336 | 26,175 |
| 1979 | 25,946 | 27,750 |
| 1980 | 28,170 | 29,675 |
| 1981 | 30,850 | 31,775 |
| 1982 | 33,680 | 34,000 |
| 1983 | 35,920 | 35,750 |
| 1984 | 39,160 | 38,250 |
| 1985 | 41,960 | 38,900 |

Further, the difference between the increases in 1983, 1984, and 1985 are not that significant: $170, $910, and $3,060 respectively. Also, as previously stated, rewarding junior persons for greater productivity is not discriminatory.

Furthermore, if one looks at the individual salary increases for each individual year at issue, Tagatz never received a salary increase that was less than a Catholic professor received except for 1980 and 1984.[2]

## 2. SALARY INCREASES FOR YEARS 1968–1985 COMPARING INCREASES BETWEEN CATHOLICS and NON–CATHOLICS WHO HAVE BEEN CONTINUOUS EMPLOYEES SINCE 1969*

| | 69-70 | 70-71 | 71-72 | 72-73 | 73-74 | 74-75 | 75-76 | 76-77 | 77-78 | 78-79 | 79-80 | 80-81 | 81-82 | 82-83 | 83-84 | 84-85 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| **CATHOLIC** | | | | | | | | | | | | | | | | |
| Collins | **900** | 980 | 750 | 700 | 1000 | 1475 | 1600 | 1600 | 1500 | 1650 | 2100 | 2800 | 2150 | **1200** | **1800** | 1200 |
| DeRoche | 750 | 950 | 1100 | 750 | 1000 | 1866 | 2084 | 1583 | 1470 | 2850 | | | | | | |
| DuPuis | 1400 | 980 | **800** | **600** | 1100 | 1720 | **1000** | 1100 | 1500 | 1700 | 2400 | 3000 | 3300 | 3000 | 3800 | 4000 |
| Ivanoff | **600** | 980 | **800** | **400** | **800** | **1320** | 1800 | 1100 | **1000** | **1300** | 1800 | 2350 | **1100** | 2000 | **2300** | 2100 |
| Nader | 0 | **600** | **600** | **500** | **700** | **1050** | **1000** | **850** | 2000 | 0 | **1600** | 1850 | **1100** | **1200** | | |
| Nordberg | 1300 | 1100 | 700 | 400 | 950 | 2133 | 2083 | 1667 | 1750 | 0 | 2667 | 2750 | 3000 | 2000 | 3300 | 3000 |
| Schimoniak | 950 | 1200 | 850 | 1000 | **950** | **1500** | 1500 | 1200 | **1250** | 1450 | 1800 | | 3000 | 2000 | 3300 | 3000 |
| Thompson | **700** | 980 | 900 | 350 | **700** | **1570** | 1600 | 1200 | 1400 | 1400 | 2150 | 2500 | 3550 | 3000 | 5000 | 3700 |
| **NON-CATHOLIC** | | | | | | | | | | | | | | | | |
| Bogenschild | 500 | 650 | 550 | 500 | 625 | 1975 | 2000 | 1400 | 1400 | 1450 | 2000 | 2150 | 1700 | 1200 | 1200 | 1200 |
| Houston | 250 | 500 | 550 | 450 | 700 | 1000 | 1450 | 1100 | 1000 | 1100 | 1550 | 1750 | 1650 | 1200 | 1100 | 1000 |
| Steeves | 1300 | 1200 | 2500 | 4500 | (3250) | 1250 | 1000 | 1350 | 1000 | 1750 | 2200 | 2600 | 3100 | 2000 | 2700 | 1300 |
| Tagatz | **1000** | **900** | **800** | **750** | **1000** | **1600** | **1500** | **1000** | **1300** | **1400** | **1650** | **1500** | **1450** | **1500** | **2300** | 0 |
| Topetzes | 400 | 600 | 450 | 300 | 650 | 1600 | 1000 | 850 | 950 | 1000 | 1350 | 1500 | 2250 | 2000 | 2000 | 8000 |

* Increases are from the salaries listed on Table I of plaintiff's exhibit 18. The bold type increases for Catholics are less than or equal to the salary increase Tagatz received. In years 1980–81 Tagatz received an increase that was $250 less than the lowest increase received by a Catholic. In 1985, Tagatz did not receive any increase. In all other years, Tagatz received an increase that was greater to or equal to the increase received by a Catholic.

In 1980, Tagatz's salary increase was $1,500. Professor Nader who is Catholic received the lowest salary increase of the Catholic professors which was $1,850. In 1984, Tagatz received no salary increase, but there is no evidence that a raise was not given because of his religion. In fact, the testimony of Tagatz's students in 1984 demonstrates that his performance as a professor was poor. Individually, there is no evidence that Tagatz was discriminated against on the basis of religion in the setting of salary increases.

The only other evidence of religious discrimination was the comment by Dr. Nordberg regarding Dr. Sargent's Eastern Star ring. This Court questions, however, how a comment to Dr. Sargent shows that Dr. Tagatz himself was discriminated against. It does not.

Secondly, there was testimony that Nordberg stressed the mission of the University and that Catholic doctrine should be taught to the extent possible in every course. It must be recognized that Marquette is a Jesuit University and that Catholic doctrine is an important part of the University. Moreover, based on the testimony presented, there is no evidence that Catholic doctrine can be taught in a statistics course. Thus, the statement by Nordberg has no applicability to Tagatz. Plaintiff has not presented a *prima facie* case of religious discrimination.

■ Even if a *prima facie* case was presented, Marquette has articulated legitimate nondiscriminatory reasons for Dr. Tagatz's salary increases. First, Dr. Tagatz did not receive consistent student evaluations.

Summary-Student Evaluations of
Teaching Effectiveness

| Date | School | TZ |
|------|--------|------|
| May, 1973 | 85.62 | 49.50 |
| Dec., 1973 | 57.6 | 59.0 |
| March, 1974 | | 58.98 |
| May, 1975 | 58.5 | 64.1 |
| Dec., 1976 | 58.4 | 45.9 |
| Dec., 1977 | 55.3 | 40.7 |
| Dec., 1979 | 53.7 | 59.2 |
| Jan., 1981 | 58.1 | 61.6 |

In May 1973 and December 1977, Tagatz received the lowest student evaluations. In December 1976, he was second lowest in the school. Further, there was testimony of students and letters from students complaining about Tagatz's teaching. Further, although Tagatz published a book in 1976, other professors were certainly more active. Finally, it is clear that Tagatz did not work well with established procedures. The instances of his general uncooperative attitude were described in the findings of fact. Plaintiff has failed to demonstrate that the legitimate reasons set forth by Marquette are a pretext. All plaintiff has presented are statistics which the Court feels do not fully present the whole picture.

Because plaintiff has failed to establish a *prima facie* case of disparate treatment on the basis of age or religion in the setting of salaries and even if a *prima facie* case had been established, Marquette has established legitimate nondiscriminatory reasons for Tagatz's salary increases. Judgment on this issue is entered in favor of Marquette University.

B. Disparate Impact Analysis

■ A claim of disparate impact exists when plaintiff alleges that facially neutral employment criteria have a disproportionate impact on a protected class. If the plaintiff establishes the existence of a neutral policy with a disproportionate impact, a *prima facie* case of disparate impact exists. "Once this is purportedly shown, the defendant may, of course, demonstrate that there are deficiencies in the plaintiffs' statistical evidence." *Griffin v. Board of Regents of Regency Univ.*, 795 F.2d 1281, 1287 (7th Cir.1986). The burden is then shifted to the defendant to show that the practice is justified by business necessity. Proof of intentional discrimination is not required to be shown. *Lowe v. City of Monrovia*, 775 F.2d 998, 1004 (9th Cir. 1985). Discriminatory impact is proven by showing "that an employment practice selects members of a protected class in a proportion smaller than their percentage in the pool of actual applicants." *Moore v. Hughes Helicopters, Inc.*, 708 F.2d 475, 482 (9th Cir.1983) (citing *Johnson v. Uncle Ben's Inc.*, 657 F.2d 750, 753 (5th Cir.1981),

*cert. denied,* 459 U.S. 967, 103 S.Ct. 293, 74 L.Ed.2d 277 (1982)). Plaintiff in this case challenges the three factors of teaching, scholarship, and service. Plaintiff argues that these three factors have a discriminatory impact on non-Catholics and those professors over forty years old. In order to establish a *prima facie* case of disparate impact, plaintiff must demonstrate a causal connection between the criteria of teaching, scholarship, and service and the alleged discriminatory impact on non-Catholics and those over forty. Likewise,

> [w]here the disparate impact doctrine has been used by the courts in individual actions rather than class actions, a plaintiff has been required to show that he personally has been the victim of discrimination by the general practice which allegedly resulted in a discriminatory impact on a protected group. It is not sufficient for an individual plaintiff to show that the employer followed a discriminatory policy without also showing that plaintiff himself was injured.

*Coe v. Yellow Freight System, Inc.,* 646 F.2d 444, 451 (10th Cir.1981); *Robinson v. Polaroid Corp.,* 732 F.2d 1010, 1016 (1st Cir.1984).

■ As previously addressed, this Court is persuaded that the statistics compiled by plaintiff do not establish a *prima facie* case of age or religious discrimination. Tagatz's conclusions are statistically significant and the chance of the variance rankings occurring by chance is very small, but this Court is not persuaded that the statistics demonstrate a *prima facie* case of disparate impact against the plaintiff. First, the statistics fail to account for variables such as how many books were published by a professor, how many grants a professor obtained, how many graduate students a professor advised, or the level of student evaluations. These factors are all things that Dean Nordberg and Father Hennessey took into account when setting salaries. In the absence of statistics applying these criteria, only part of the picture is presented.

Secondly, as previously stated, plaintiff has shown no individual harm. He received fair actual dollar salary increases. See the discussion of this factor under the disparate treatment analysis.

Furthermore, plaintiff has failed to show causation between the three criteria and age or religious discrimination. The statistics in this case do not demonstrate a *prima facie* case of disparate impact based on age or religion.

The abilities of a university professor are very wide. Thus, the criteria applied to them must also be far ranging. Plaintiff would like a system that would quantify the relative weights of research, teaching and service. This Court is not persuaded that such quantification is required. Academia is an untangible area. One person may excel in teaching while lacking in research. Another professor may excel in research and service while lacking in teaching. Both professors may be equally valuable to the university, and entitled to a similar salary increase because of their value, but under a system of weighted criteria, they may not receive the same salary increase. If a university chooses to weight the factors, that is fine, but a university should not be required to do so.

Plaintiff argues that it is impossible to address what values may be given to a specific factor, and thus, that person may not know what areas need improvement. This argument may be persuasive if made by someone who showed individual harm and who raised the issue of salary increases with the university. Tagatz, however, never objected that his salary increases were improper. He never tried to find out what areas he needed to improve in. It is difficult because Tagatz failed to complain to Marquette regarding his salary increases to give his argument any merit.

Tagatz has failed to establish a *prima facie* case of disparate impact in the setting of salaries based on age or religion.

### C. Religious Discrimination on the Basis of Fringe Benefits

■ This issue is essentially whether or not it is discriminatory for Marquette University to provide free housing, and no deductible for certain items such as health insurance to the Jesuits. The Jesuits re-

turn their salary to the University. In return, they receive these benefits. This Court does not find these benefits improper especially since it is important that Marquette maintain a Jesuit presence. Without the Jesuits, Marquette would not be Marquette. *Pime v. Loyola University of Chicago,* 803 F.2d 351 (7th Cir.1986). Further, if the University did not provide these benefits, the Court questions how the Jesuits would survive since they turn their salaries over to the University. If Dr. Tagatz would like the same benefits, perhaps Marquette would be interested in negotiating a contract with him whereby he would turn over his salary to the University and in exchange he could receive such benefits.

The Court finds that judgment is appropriately entered in favor of Marquette University on this issue.

D. Requirement to Teach Catholicism

The Court does not find that the requirement to teach Catholicism is an unlawful condition of employment for plaintiff because as plaintiff admitted, Catholicism is inapplicable to the study of statistics. Thus, it was not a condition which applied to plaintiff.

E. Religious and Sex Discrimination in Sabbaticals

This Court finds no merit to the argument that Marquette discriminated on the basis of religion and sex in granting sabbaticals. It is clear that all persons, male and female who had sabbaticals before plaintiff had earlier appointment dates.

Judgment in favor of Marquette University is merited on this issue.

IV. CONCLUSION

Plaintiff has failed to present a *prima facie* case of religious or age discrimination under a disparate treatment or disparate impact analysis. Also, plaintiff has failed to present a *prima facie* case of religious discrimination on the basis of fringe benefits, and a *prima facie* case of religious and sex discrimination in awarding sabbaticals. Finally, plaintiff has failed to show

that the requirement to teach Catholicism is an unlawful condition of employment.

Accordingly, the Court finds that JUDGMENT in favor of Marquette University is appropriate.